# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

VINCENT RALPH BOSCA,

Defendant-Appellant.

FOR PUBLICATION
March 26, 2015
9:00 a.m.

No. 317633
Macomb Circuit Court
LC No. 2011-003548-FH

Before: RIORDAN, P.J., and BECKERING and BOONSTRA, JJ.

BOONSTRA, J.

Defendant appeals by right his jury trial convictions of: (a) extortion, MCL 750.213; (b) four counts of unlawful imprisonment, MCL 750.349b; (c) four counts of assault with a dangerous weapon (felonious assault),[1] MCL 750.82; (d) possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(a); (e) delivery and manufacture of marijuana, MCL 333.7401(2)(d)(*iii*); and (f) maintaining a drug house, MCL 333.7405(d). Defendant was sentenced to 57 months to 20 years' imprisonment for the extortion conviction, 57 months to 15 years' imprisonment for each conviction of unlawful imprisonment, two years to four years' imprisonment for each assault conviction and for the manufacture and delivery of marijuana conviction, two years' imprisonment for the felony-firearm conviction, and one year to two years' imprisonment for the conviction of maintaining a drug house. In addition to

---

[1] Defendant has characterized his conviction as that of assault and battery, MCL 750.81, which is a misdemeanor. The judgment of sentence lists his convictions as "assault or assault and battery" and indeed cites MCL 750.81. Additionally, at least one pretrial order refers to the charges against defendant as being assault with intent to commit bodily harm less than murder, MCL 750.84. However, the trial transcript reveals, and defendant correctly characterized at oral argument on appeal, that defendant was actually convicted of four counts of assault with a dangerous weapon, MCL 750.82. At sentencing, the court also referred to his convictions as being for assault with a dangerous weapon. Finally, the pre-sentence information report (PSIR) lists defendant's convictions as being for assault with a dangerous weapon, MCL 750.82. We therefore analyze defendant's convictions as being under MCL 750.82. As stated at the end of this opinion, we remand for administrative correction of the judgment of sentence to conform to the jury verdict.

-1-

various restitution requirements, defendant was also required to register in accordance with the sex offenders registration act (SORA), MCL 28.721 *et seq.* We affirm defendant's convictions and sentences. We reject defendant's constitutional challenges with regard to SORA registration, but call upon the Legislature to address aspects of the statute. We remand to the trial court for entry of an amended judgment of sentence conforming defendant's sentences to the jury verdict.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise out of an incident that occurred on June 13, 2011 in Sterling Heights, Michigan. After four minor teenaged boys broke into defendant's home to steal his marijuana, defendant and two associates, Gerald King and Allen Brontkowski, captured and held them against their will in defendant's basement. The boys testified that they were duct-taped to chairs, hit with a pistol, kicked and beaten, and threatened with a sword, hatchet, pliers, cigar cutter, flammable liquids, and a circular saw.

Some of the boys were among those individuals whom, with the help of defendant's son, had broken into defendant's house a few days before this incident and had stolen marijuana. Defendant planned to entice the perpetrators of that initial break-in to return to the house and lay in wait for them with his associates, who were armed with a gun and a hatchet. On the day of the second incident, two of the boys entered defendant's home through a kitchen window. They then opened the front door to admit a third boy, while a fourth remained on the porch. One of the boys managed to escape, but defendant and his associates captured the other three boys and held them in the basement, duct-taped to chairs. Defendant forced one of the three to call the boy who had escaped and tell him to return to the house and assist with the removal of marijuana;[2] defendant forced another of the boys to call others who had been involved in the prior theft of marijuana and tell them "he needed help getting the marijuana out of the house." Two more boys arrived at the house shortly thereafter; defendant and his associates were able to catch one of them, and threw him down the stairs into the basement with the original three imprisoned boys. The new arrival was able to call 911 before defendant smashed his phone; as punishment, defendant broke the sheath of his sword over the teen's head. Defendant then duct-taped his hands and legs together.

Sterling Heights police responded to the 911 call. By that time, at least some of the boys had been held captive for approximately three hours. Two of the boys were transported to the hospital for treatment, one in an ambulance and one by his mother. In searching defendant's home, police discovered a sword and broken sheath, duct tape, a cigar cutter, an electric circular saw, pliers, and a loaded handgun possessed by Brontkowski. Officers found blood stains on the basement floor and walls, as well as on the sword sheath and Brontkowski's pants; the blood on the sheath and pants was DNA-matched to one of the boys. Defendant admitted to duct-taping the boys to chairs.

---

[2] The boy who escaped the initial confrontation did not return to defendant's house; he testified that he went to a nearby mall and did not contact the police.

Marijuana plants and marijuana were found in the basement and garage. Detective Jason Modrzejewski of the Sterling Heights Crime Suppression Unit collected evidence from the residence and dismantled defendant's grow operation. Two grow locations were identified in a room at the south end of the residence attached to the garage and in the basement. Modrzejewski asserted that he could detect the odor of marijuana from the driveway before entering the residence. He collected seedlings from a basement cabinet and found jars of marijuana "all over the place," including behind insulation, in floor joists, and in cabinets. He also confiscated marijuana from the saddlebag of a motorcycle in the garage. He opined at trial that the total amount of marijuana confiscated exceeded that permissible for personal medical marijuana use. A controlled substance unit expert determined that the amount of plant material identified as marijuana totaled 578.6 grams, or 1.27 pounds. The police confiscated 87 plants, 78 of which were identified as marijuana.

At trial, defendant asserted that he was a licensed caregiver under the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.*,[3] and presented the testimony of an expert, Frank Telewski, a Michigan State University professor of water and plant biology. Telewski opined that the plants seized were under a moderate level of stress and showed evidence of mold, spider mites and eggs. He believed that the infestation had degraded and killed some of the plants and that it was unlikely that the infested plants could be used for medical marijuana. He asserted that the amount confiscated, when considering the damaged plants and the status of some of the material as uncured, did not exceed the amount that five patients could use in accordance with defendant's licensure.

The jury convicted defendant as described above. At his sentencing hearing on September 4, 2012, defendant's counsel sought to disqualify the prosecutor's office, asserting that the prosecutor had only pursued legal action against defendant on behalf of the boys as victims but had concurrently ignored defendant's status as a victim of the boys based on the prior break-in and theft from his home. The prosecutor responded, citing the discretion afforded in bringing criminal charges, and the trial court denied the motion. At sentencing, defendant indicated that there were inaccuracies in the presentence investigation report and objected to the scoring of offense variables (OVs) 1, 2, 3, 4, 7, 8, 10 and 13. He also asserted that a downward departure from the guidelines would have been appropriate. The trial court imposed the sentence described above.

Following sentencing, defendant filed a motion for a new trial or judgment of acquittal, and for resentencing. Specifically, defendant challenged the great weight of the evidence and asserted a lack of evidence of criminal intent to support the convictions, and asserted that the prosecution committed misconduct in failing to disclose or obtain cellular telephone records and

---

[3] Although the title and provisions of the MMMA refer to "marihuana," "by convention this Court uses the more common spelling 'marijuana' in its opinions." *People v Carruthers*, 301 Mich App 590, 593, n 1; 837 NW2d 16 (2013) (citations omitted). This opinion will thus refer to "marijuana" apart from direct quotation of statutory language and the title of the MMMA.

medical records of the victims. He also requested a *Ginther*[4] hearing on the ineffective assistance of his trial counsel, citing the failure of counsel to pursue or obtain these records through discovery. Defendant also challenged the requirement that defendant register as a sex offender pursuant to SORA, as an unconstitutional violation of his rights to due process and to be free from cruel and unusual punishment.

The trial court issued a written opinion and order on defendant's motion on July 24, 2013. In evaluating defendant's numerous sentencing challenges, the trial court indicated satisfaction with the original handling of defendant's objections to the scoring of the various OVs and determined that reassessment of the scoring was unnecessary. The trial court similarly found it unnecessary to revisit defendant's request for a downward departure because "these issues . . . were previously addressed and adequately supported by the record." The trial court determined that defendant's challenge to the requirement that he register under SORA to be one that "should be fully litigated." The trial court instructed the prosecutor to respond to defendant's challenges on this issue and to that extent granted defendant's motion for resentencing in part. The trial court denied the remainder of defendant's motion. The trial court did not make a final ruling on the SORA issue prior to defendant's August 9, 2013 filing of a claim of appeal. Thereafter, on March 6, 2014, the trial court issued an opinion and order denying defendant's motion for resentencing regarding the SORA issue. On March 25, 2014, this Court granted defendant's motion (which was unopposed by plaintiff) to file a supplemental brief on appeal with respect to that issue, and accepted defendant's previously-submitted supplemental brief for filing. Plaintiff filed a supplemental brief in response on April 15, 2014.[5]

## II. GREAT WEIGHT OF THE EVIDENCE

Defendant first contends that the jury's verdicts are against the great weight of the evidence. Defendant contends that the acknowledged lack of veracity of the witnesses and their own criminal conduct in the events that led to the charges against defendant render their testimony inherently implausible or patently incredible. We disagree.

"An appellate court will review a properly preserved great-weight issue by deciding whether 'the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand.' " *People v Cameron*, 291 Mich App 599, 616-617; 806 NW2d 371 (2011) (citation omitted). A trial court's denial of a motion for a new trial is

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[5] For clarity, we note that defendant's trial was held before, and the September 4, 2012 judgment of sentence was issued by, then-Circuit Judge David F. Viviano. The July 24, 2013 opinion and order denying defendant's motion for new trial or judgment of acquittal, denying in part defendant's motion for resentencing, and ordering plaintiff to respond to defendant's motion for resentencing (relative to the SORA issue), was issued by Judge Thomas W. Brookover. The March 6, 2014 opinion and order denying defendant's motion for resentencing relative to the SORA issue was issued by Judge Jennifer Faunce.

reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008).

It is well recognized that the threshold necessary for a judge to overrule a jury and grant a new trial "is unquestionably among the highest in our law." *People v Plummer*, 229 Mich App 293, 306; 581 NW2d 753 (1998) (quotation marks and citation omitted). "When analyzing a great weight challenge, no court may sit as the '13th juror' and reassess the evidence." *People v Galloway*, 307 Mich App 151, 167; ___ NW2d ___ (2014)(citation omitted). In general, conflicting testimony and questions of witness credibility constitute insufficient grounds for the granting of a new trial, *People v Lemmon*, 456 Mich 625, 643; 576 NW2d 129 (1998), and, "absent exceptional circumstances," issues of witness credibility are within the exclusive province of the trier of fact. *Id*. at 642-643. "To support a new trial, the witness testimony must 'contradict[ ] indisputable physical facts or laws,' be 'patently incredible or def[y] physical realities,' be 'so inherently implausible that it could not be believed by a reasonable juror,' or have been 'seriously impeached' such that 'the case [was] marked by uncertainties and discrepancies.' " *Galloway*, 307 Mich App at 167 (citation omitted).

Copious testimony was elicited during trial from the boys involved in this matter acknowledging the earlier entry into defendant's residence, the theft of marijuana on a previous occasion, and their entry on the later occasion with the intent to procure additional marijuana for their personal use and sale. The boys also admitted being untruthful when interviewed by the police. While testimony varied regarding who wielded the various weapons used, who engaged in verbal threats, and the number and initiator of the physical strikes incurred, testimony was consistent that these incidents occurred while the boys were in the home. In addition, testimony was consistent regarding the use of duct tape to restrain the boys. King confirmed being contacted by defendant and asked to be present at his home in the event of another home invasion on the date of the second incident. When defendant and his associates heard a knock on the front door on that occasion, they did not act to prevent another home invasion by answering the door, but instead waited, anticipating that the boys would enter the home. Testimony was also elicited indicating that defendant coerced two of the boys to contact others who may have been involved in the prior break-in to attempt to induce them to return to the residence. King testified that he had a hatchet and that Brontkowski had a handgun. King further acknowledged that he, defendant and Brontkowski hit the boys with their fists, pushed them down the basement stairs, blocked their escape, struck them with the blunt end of a hatchet, a sword sheath, and their fists, threatened them with a cigar cutter, a circular saw and a handgun, and subjected them to a plethora of verbal threats. Physical evidence corroborated a great deal of this testimony.

In terms of the marijuana charges, testimony was elicited that defendant was a licensed grower. Evidence was also introduced regarding the extensiveness of defendant's grow operation and the amounts of marijuana and plants confiscated. Contradictory testimony was introduced regarding the viability of certain plants, the status of some of the marijuana as not fully cured, and the damage to part of the crop due to infestation. Conflicting opinions were also elicited regarding whether the amount of marijuana in defendant's possession exceeded that amount permitted by his licensure.

In sum, the jury had before it a substantial amount of testimony and evidence, which was both consistent and contradictory on certain points. Our review of the evidence available to the

jury leads us to the conclusion that it was not so incredible or contradictory to necessitate or permit judicial intervention. *Galloway*, 307 Mich App at 167. The jury was repeatedly informed that the boys had been untruthful and had engaged in illegal activity in entering defendant's residence and in seeking to procure marijuana. They admitted to the illegal use of marijuana, including on the day of these events. Defendant repeatedly asserted a theory of his case based on his right to defend his home and property from intruders and theft, and based on the absence of any criminal intent in seeking to scare the intruders in his home. It was acknowledged that defendant was a licensed grower, but controversy existed regarding the amount of marijuana in his possession. The jury clearly rejected defendant's position and found, instead, that the boys' testimony was credible. We will not interfere with the jury's role in ascertaining both credibility and weight of evidence. *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

## III. SUFFICIENCY OF THE EVIDENCE

Next, defendant generally asserts the absence of sufficient evidence to sustain any of his 12 convictions. Initially, we note that, other than citing the law pertaining to issue preservation and standard of review, defendant merely relies on his great weight of the evidence argument, provides no further explanation or citation to the law or the record, and fails to address how the evidence is insufficient to support any particular element of any particular offense, resulting in an abbreviated argument in support of this claim of error. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009). Although we could thus deem the issue abandoned, we find that it is also without merit. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001).

"In determining whether the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court is required to take the evidence in the light most favorable to the prosecutor" and to ascertain "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010) (quotations marks and citations omitted). "All conflicts in the evidence must be resolved in favor of the prosecution and we will not interfere with the jury's determinations regarding the weight of the evidence and the credibility of the witnesses." *Unger*, 278 Mich App at 222. "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Allen*, 201 Mich App 98, 100; 505 NW2d 869 (1993). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). To evaluate the sufficiency of the evidence, it is necessary to review the evidence in the context of the elements of the charged crimes.

## A. EXTORTION

In recently revisiting the elements defining extortion, our Supreme Court in *People v Harris*, 495 Mich 120, 122-123; 845 NW2d 477 (2014), stated:

[T]he plain language of the extortion statute, MCL 750.213, defines extortion in terms of whether the defendant maliciously threatened a person with harm in order to "compel the person so threatened to do . . . any act against his will." Thus, the Legislature clearly intended the crime of extortion to occur when a defendant maliciously threatens to injure another person with the intent to compel that person to do any act against his will, without regard to the significance or seriousness of the compelled act.

In this instance, there was repeated testimony that defendant and his associates verbally threatened the boys with physical harm, in addition to using various weapons or items to inflict injury. Several of the threats were directed at the boys to compel or encourage them to provide defendant with the identity and contact information of other individuals who had previously entered his home and removed marijuana, and to solicit their assistance in luring those individuals to return to the home. In addition, defendant and his associates engaged in these activities to compel the boys to provide information regarding their own identities and to obtain contact information regarding their parents. This satisfies the "threat" and "act against his will" elements of the crime. *Id*. In addition, "only those threats made with the intent to commit a wrongful act without justification or excuse, or made in reckless disregard of the law or of a person's legal rights, rise to the level necessary to support an extortion conviction." *Id*. at 136. "The existence of malice . . . depends on the facts and circumstances of each case and can be inferred from a defendant's conduct." *Id*. at 139. Defendant and his associates threatened the boys with physical harm if they did not cooperate. These threats were enhanced by the use of weapons in an effort to obtain the desired information. More than one boy testified that defendant became more incensed and violent when told of his own son's involvement in the prior theft. The evidence was thus sufficient to satisfy the element of "malice." Consequently, sufficient evidence existed to establish the elements of extortion.

### B. UNLAWFUL IMPRISONMENT

The elements of unlawful imprisonment are delineated in MCL 750.349b as follows:

(1) A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:

(a) The person is restrained by means of a weapon or dangerous instrument.

(b) The restrained person was secretly confined.

(c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony.

The term "restrain" is defined within the statute as "to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). Restraint may be temporary. MCL 750.349b(3)(a); *People v Railer*, 288 Mich App 213, 218-219; 792 NW2d 776 (2010). The term "secretly confined" is defined to mean: (a) "[t]o keep the confinement of the restrained person a secret" or (b) "[t]o keep the location of the restrained person a secret."

MCL 750.349b(3)(b). This definition was further explained in *People v Jaffray*, 445 Mich 287, 309; 519 NW2d 108 (1994), as follows:

> the essence of "secret confinement" as contemplated by the statute is deprivation of the assistance of others by virtue of the victim's inability to communicate his predicament. "Secret confinement" is not predicated solely on the existence or nonexistence of a single factor. Rather, consideration of the totality of the circumstances is required when determining whether the confinement itself or the location of confinement was secret, thereby depriving the victim of the assistance of others.

Sufficient evidence was adduced at trial to sustain defendant's four convictions of this offense. There was no dispute that the boys were forced down the basement steps and their escape prevented. They were restrained with duct tape. Their cellular telephones were confiscated. Defendant restricted their ability to access their telephones and monitored the information communicated, with threats of injury or harm should the boys not comply with his instructions. The boys were fearful, as evidenced by the fact that two of them lost control of bodily functions. They were precluded from securing outside assistance, as one boy's telephone was destroyed when he attempted to contact police by calling 911.

Defendant contends that his imprisonment of the boys was not "without lawful authority," MCL 750.349b(3)(a), as defendant asserts that he was entitled to defend himself and his home, to stand his ground, to stop a fleeing felon, to eject trespassers, and to arrest and detain felons, and to pursue and retake a person who has escaped or been rescued from a lawful arrest. Assuming all of that to be true, however, the evidence in this case does not implicate any such rights. Rather, the evidence reflected that defendant constructed a scenario to lure the boys to his home and, upon apprehending them, engaged in a level of conduct and force that the jury deemed excessive in relation to the threat presented. We will not interfere with a jury's assessment of the weight of the evidence or the credibility of the witnesses. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013).

Moreover, even assuming that defendant possessed a right to "arrest" the boys who had entered his home on the day of the second incident, he was then obligated by law to "without unnecessary delay deliver the person arrested to a peace officer." MCL 764.14. Defendant did not do so. To the contrary, defendant imprisoned the boys for several hours, during which time he and his associates assaulted and threatened them. Further, defendant sought to prevent the boys from contacting the police, and thereby he acted precisely contrary to his lawful obligation to deliver the boys to the police "without unnecessary delay." *Id*. Consequently, sufficient evidence was adduced to support defendant's four convictions under MCL 750.349b.

### C. ASSAULT WITH A DANGEROUS WEAPON

"The elements of [assault with a dangerous weapon] are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). "A person who aids or abets the commission of a crime may be convicted and

punished as if he directly committed the offense." *People v Izarraras-Placante*, 246 Mich App 490, 495; 633 NW2d 18 (2001); MCL 767.39.

> To support a finding that a defendant aided and abetted a crime, the prosecution must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. [*Izarraras-Placante*, 246 Mich App at 495-496 (quotation omitted).]

"The aiding and abetting statute encompasses all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime." *Id*. at 496 (citation omitted). Intent may be inferred from a defendant's "words, acts, means, or the manner used to commit the offense." *People v Harrison*, 283 Mich App 374, 382; 768 NW2d 98 (2009). A dangerous weapon is defined by MCL 750.226 to comprise "a pistol or other firearm or dagger, dirk, razor, stiletto, or knife having a blade over 3 inches in length, or any other dangerous or deadly weapon or instrument" carried with the intent to unlawfully use the same against another person. In addition, "[a] dangerous weapon can also be an instrumentality which, although not designed to be a dangerous weapon, is used as a weapon and, when so employed, is dangerous." *People v Barkley*, 151 Mich App 234, 238; 390 NW2d 705 (1986),

Testimony and evidence demonstrated that an assault was perpetrated on all of the boys. All incurred some form of injury and intimidation, albeit non-life threatening, including being struck with or threatened by fists, a handgun, a circular saw, pliers, a cigar cutter, a hatchet and a sword sheath, as well as being physically forced into defendant's basement. While defendant did not physically wield every weapon, testimony indicated that he told Brontkowski to bring a gun to the residence, and that he handed items to King for use in threatening the boys. Several of the boys testified that defendant wielded the sword sheath to strike them and to inflict injury. While defendant challenges the intent element of this crime, it is undisputed that his intent was, at a minimum, to scare the boys. His success in accomplishing this was demonstrated by testimony and physical evidence that the boys were crying and that two of them lost control of their bodily functions because of the level of fear they experienced. The evidence is sufficient to sustain defendant's convictions for assault with a dangerous weapon either directly or under an aiding and abetting theory.

## D. FELONY-FIREARM

"The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *Avant*, 235 Mich App at 505. Several witnesses testified to the presence of a handgun in defendant's residence and its use to threaten or intimidate the boys, so as to effectuate the acts underlying the charges of extortion and unlawful imprisonment. Under an aiding and abetting theory, it is irrelevant that the handgun belonged to and was most frequently wielded by Brontkowski. See *Izarraras-Placante*, 246 Mich App at 495-496. Physical evidence of a text message sent by defendant to Brontkowski instructing him to bring his gun to the residence on the day of these events demonstrates

-9-

defendant's complicity in the procurement and use of this weapon under an aiding and abetting theory. *Id*. As such, there is sufficient evidence to support defendant's conviction of felony-firearm.

## E. MANUFACTURING A CONTROLLED SUBSTANCE

The elements of manufacturing of a controlled substance include: (1) the defendant manufactured a substance; (2) the substance manufactured was the controlled substance at issue; and (3) the defendant knowingly manufactured it. *People v Meshell*, 265 Mich App 616, 619; 696 NW2d 754 (2005). The manufacture of a controlled substance is defined as "the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and synthesis." MCL 333.7106(2); *People v Hunter*, 201 Mich App 671, 676; 506 NW2d 611 (1993). Further, "marihuana means all parts of the plant Cannabis sativa L, growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its seeds and resins." MCL 333.7106(3).

There was no dispute that the plants and materials removed from defendant's residence constituted marijuana. While the efficacy of certain plants and products derived therefrom was in dispute, the identification of the materials as marijuana was not contested. Evidence was introduced verifying the confiscation of at least 78 marijuana plants and at least 578.6 grams of harvested marijuana. Testimony was also presented indicating that marijuana was found throughout the residence, including behind insulation, in floor joists, and in cabinets and other areas, and that its presence was so pervasive in the home that its odor could be detected from the driveway. Although the amounts confiscated included marijuana retrieved from King's motorcycle saddlebag, this amount, asserted by King to comprise one-quarter ounce, was minimal in the overall context of the plant material confiscated. Although defendant was acknowledged to be a licensed grower, the dispute actually centered on whether the amount he manufactured and maintained exceeded the legal amount permitted by his licensure. While contradictory testimony was adduced on this issue, it is apparent from defendant's conviction that the jury found the testimony of an excessive amount of marijuana within the home to be more credible. This Court will not second-guess a jury's determination of credibility and weighing of the evidence on appeal. *Kanaan*, 278 Mich App at 619. Hence, sufficient evidence exists to support defendant's conviction on this charge.

## F. MAINTAINING A DRUG HOUSE

Finally, the crime of maintaining a drug house is governed by MCL 333.7405(d), which provides that a person

> [s]hall not knowingly keep or maintain a store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place, that is frequented by persons using controlled substances in violation of this article for the purpose of using controlled substances, or that is used for keeping or selling controlled substances in violation of this article.

"The phrase 'keep or maintain' implies usage with some degree of continuity that can be deduced by actual observation of repeated acts or circumstantial evidence . . . that conduces to the same conclusion." *People v Thompson*, 477 Mich 146, 155; 730 NW2d 708 (2007).

Sufficient evidence was adduced for a rational trier of fact to find that defendant kept or maintained the residence, and that it was used for "keeping or selling" controlled substances, with "some degree of continuity." MCL 333.7405(d); *Thompson*, 477 Mich at 155. It was undisputed that defendant owned and resided at this location. Additionally, there was no dispute that defendant used the premises to grow marijuana. Once again, the dispute is over whether defendant manufactured more marijuana than legitimately permitted under his license as a grower. Premised on the jury's factual determination that defendant's crop exceeded his legitimate manufacture, sufficient evidence was presented to sustain this conviction.

## IV. PROSECUTORIAL ERROR[6]

Defendant next asserts a myriad of alleged acts of prosecutorial error involving discovery and other actions in contradiction of the requirements mandated by *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Specifically, defendant asserts that the prosecution improperly delayed or precluded the discovery of the boys' cellular telephone records, medical records, and taped statements to the police. In part, defendant suggests that the alleged discovery delays negatively impacted the outcome of the preliminary examination. In addition, defendant contends that the prosecution failed to fully disclose the sentencing agreement entered into with King in return for his trial testimony, that errors occurred in the failure to distinguish marijuana confiscated from King's motorcycle saddlebag from the marijuana retrieved from defendant's home, and that the prosecution's running of the circular saw during rebuttal closing argument was improper and unduly prejudicial to defendant.

This Court reviews a trial court's decision regarding a discovery violation for an abuse of discretion. MCR 6.201(J). Defendant bears the burden of proving that the evidence was exculpatory or, in the case of failure to preserve evidence, that the police acted in bad faith. *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007). "This Court reviews a trial court's decision to grant or deny a motion for new trial for an abuse of discretion." *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). "Underlying questions of law are reviewed de novo, while a trial court's factual findings are reviewed for clear error." *People v Terrell*, 289 Mich App 553, 559; 797 NW2d 684 (2010) (citations omitted). To prevail on a claim of prosecutorial error, a defendant, in general, must demonstrate that he or she was "denied a fair and impartial trial." *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). "We

---

[6] Courts and litigants frequently have referred to claims such as that raised by defendant as "prosecutorial misconduct." This Court has recently stated that "the term 'misconduct' is more appropriately applied to those extreme . . . instances where a prosecutor's conduct violates the rules of professional conduct or constitutes illegal conduct," and concluded that claims "premised on the contention that the prosecutor made a technical or inadvertent error at trial" are "more fairly presented as claims of 'prosecutorial error.' " *People v Cooper*, __Mich App __; __NW2d __ (2015) (Docket No. 318159), slip op at 7 (citation omitted).

review de novo [a] defendant's constitutional due-process claim." *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

## A. DISCOVERY VIOLATION

Discovery in a criminal case is governed by MCR 6.201. *People v Phillips*, 468 Mich 583, 587; 663 NW2d 463 (2003). Although it is well recognized that "[t]here is no general constitutional right to discovery in a criminal case," *People v Elston*, 462 Mich 751, 765; 614 NW2d 595 (2000), a defendant can show that the police's failure to preserve evidence violated his right to due process if the evidence was exculpatory or law enforcement personnel acted in bad faith. *Hanks*, 276 Mich App at 95, quoting *People v Hunter*, 201 Mich App 671, 677; 506 NW2d 611 (1993), citing *Arizona v Youngblood*, 488 US 51, 57; 109 S Ct 333; 102 L Ed 2d 281 (1988). Even when evidence that is destroyed would have been "potentially useful," to constitute a violation of due process, the evidence must have been destroyed in bad faith. *Youngblood*, 488 US at 58.

Further, a defendant's right to due process may be violated by the prosecution's failure to produce exculpatory evidence in its possession. As recognized by our Supreme Court in *People v Chenault*, 495 Mich 142, 149-150; 845 NW2d 731 (2014) (citations omitted):

> The Supreme Court of the United States held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

A three-factor test has been devised to identify the primary elements of a *Brady* violation:

> The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. [*Strickler v Greene*, 527 US 263, 281-282, 119 S Ct 1936, 144 L Ed 2d 286 (1999).]

In other words, a *Brady* violation occurs when the prosecution has suppressed material evidence that is favorable to the accused. See *Chenault*, 495 Mich at 150. Bad faith in that event is not required to for a *Brady* violation. *Id*. at 150-151 (citations omitted).

Defendant appears to assign error to the prosecution's failure to provide discovery for both the preliminary examination and trial. With regard to the preliminary examination, as noted in *People v Laws*, 218 Mich App 447, 451-452; 554 NW2d 586 (1996) (citations omitted):

> The district court may order discovery in carrying out its duty to conduct preliminary examinations. Discovery may be ordered before the preliminary examination. . . . "The purpose of a preliminary examination is to determine whether a crime has been committed and if there [is] probable cause to believe that the defendant committed it." Significantly, when conducting a preliminary examination, "[a]n examining magistrate may weigh the credibility of witnesses." However, the role of the magistrate is not that of ultimate finder of fact; where the

evidence conflicts and raises a reasonable doubt regarding the defendant's guilt, the issue is one for the jury, and the defendant should be bound over.

Defendant's entire argument on the alleged failure to disclose medical records in time for the preliminary examination merely suggests, without citation to any supporting authority, that it impaired defendant's ability to demonstrate the lack of credibility of the boys as witnesses at the preliminary examination. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

Further, the lower court record reveals that the preliminary examination was initially delayed, by stipulation of the parties, to allow for the provision of discovery. When the preliminary examination was held on August 3, 2011, there was no indication by defense counsel of any need for discovery materials that had not been received from the prosecution. A defendant generally cannot claim error premised on a concern to which he contributes by plan or negligence. *People v Gonzalez*, 256 Mich App 212, 224; 663 NW2d 499 (2003).

Additionally, defendant appears to assume that the prosecution must secure discoverable information on behalf of defendant. It need not do so. *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003). There is no evidence in the record that the prosecution ever obtained the boys' medical records; thus there existed no necessity to provide them to defendant. Moreover, defendant acknowledges in his brief on appeal having received the boys' medical records by February 6, 2012, four months before trial. Further, the extent of injury to the boys was not an element of the crimes charged and, thus, was irrelevant to the bind-over decision by the district court. Additionally, there is nothing to suggest that the records were in any manner exculpatory. Even if the boys' injuries did not fully match their testimony, the discrepancy for purposes of the preliminary examination was irrelevant, as the district judge was not the ultimate trier of fact and "where the evidence conflicts and raises a reasonable doubt regarding the defendant's guilt, the issue is one for the jury, and the defendant should be bound over." *Laws*, 218 Mich App at 452. Consequently, defendant has failed to demonstrate either a *Brady* violation, or other discovery violation, concerning any alleged failure to produce medical records in time for the preliminary examination.[7]

Defendant further asserts that the prosecution committed error by failing to preserve the boys' cellular telephone records. Again, defendant fails to demonstrate that the prosecution failed to provide defendant with the information it had or that the information was actually exculpatory. The prosecution did provide defendant with information secured from the cellular telephones of defendant and Brontkowski, and from one of the phones obtained from the scene and belonging to one of the boys. Defendant and Brontkowski were permitted to subpoena the

---

[7] Defendant acknowledges that trial counsel received the medical records prior to trial. The boys were also present in court and subject to cross-examination, during which defense counsel repeatedly attacked their individual credibility and discrepancies between their statements to the police, at the preliminary examination, and at trial.

records of the boys. The prosecution is not required to "seek and find exculpatory evidence" or assist in building or supporting a defendant's case, nor is it required to "negate every theory consistent with defendant's innocence." *Coy*, 258 Mich App at 21. Defendant has thus again failed to demonstrate a *Brady* violation.

With regard to the police's alleged failure to preserve cellular telephone record evidence, defendant also has not shown bad faith on the part of the police deriving from the failure of various cellular service providers to maintain data beyond a specified time period. *Youngblood*, 488 US at 58. As noted, defendant was provided with the records obtained by the police. Defendant has thus not demonstrated a violation of his right to due process regarding the cellular phone records.

Defendant also accuses the prosecution of misconduct by virtue of its allegedly "piecemeal" provision of the recorded statements given to the police by the boys. Defendant does not suggest that recordings of the statements were not provided, but merely complains of a delay in the provision of certain statements, which he has not specifically identified on appeal. As with the other alleged discovery violations, defendant fails to demonstrate that the information contained in the statements was exculpatory to defendant. Instead, he merely contends that the police statements serve to support his contention that the boys were not credible based on discrepancies between their statements to the police and their trial testimony. In terms of the preliminary examination, this is once again irrelevant as the district judge was not the ultimate trier of fact. *Laws*, 218 Mich App at 452. Defendant acknowledges, on appeal, having received copies of the statements months before trial. The lower court record demonstrates that counsel for defendant repeatedly exercised the opportunity to attack the credibility of the witnesses and to impeach their testimony. Defendant has failed to establish suppression of the evidence on the part of the prosecution, which instead provided defense counsel an opportunity to review its file. Defendant's contention that a *Brady* violation occurred is again without support.

## B. FAILURE TO DISCLOSE KING'S SENTENCE

Defendant also takes issue with the alleged failure of the prosecution to disclose the "actual agreement" regarding the sentence that King would receive following his testimony in this case. King testified at trial regarding his role in and observation of the events. He acknowledged pleading guilty to the same charges as defendant, with the exception of the two drug charges. King asserted that he was not granted immunity and that he was unaware of what his sentence ultimately would be, but indicated that in exchange for his plea he had agreed to a sentence of at least 66 months in prison. The prosecution read into the trial court record a portion of the transcript of King's October 11, 2011 plea proceeding, wherein King agreed to plead guilty to ten charges in return for a 66 month minimum sentence. The trial court denied, on more than one occasion, the existence of any secret agreement regarding King's sentencing. "Under MCR 6.201(B)(5), a prosecutor has a duty to disclose the details of a witness's plea agreement, immunity agreement, or other agreement in exchange for testimony." *People v McMullan*, 284 Mich App 149, 157; 771 NW2d 810 (2009). "Similarly, pursuant to [*Brady*, 373 US 83], the prosecutor must disclose any information that would materially affect the credibility of his witnesses." *Id*. Our Supreme Court has stated: "[I]t is one thing to require disclosure of facts (immunity or leniency) which the jury should weigh in assessing a witness' credibility. It is

-14-

quite another to require 'disclosure' of future possibilities for the jury's speculation." *People v Atkins*, 397 Mich 163, 174; 243 NW2d 292 (1976), overruled in part on other grounds *People v Woods*, 416 Mich 581; 331 NW2d 707 (1982). In this instance, the prosecution recommended to the trial court a sentence for King, which the trial court was free to accept or reject. At the time of his testimony, the jury was informed of facts pertaining to King and his testimony that were sufficient for the jury to evaluate his credibility. "The focus of required disclosure is not on factors which may motivate a prosecutor in dealing subsequently with a witness, but rather on facts which may motivate the witness in giving certain testimony." *Id*. Although defendant contends that the trial court ultimately was more lenient (than the prosecution had recommended) in its sentencing of King, there is no demonstration that the more lenient sentencing was the result of any undisclosed sentencing agreement. Based on the acknowledgement of King's agreement with the prosecution and the opportunity for cross-examination of King by defense counsel, the prosecution made the requisite disclosure sufficient to permit the jury to evaluate King's credibility on the witness stand. We find no error.

## C. INCORPORATION OF KING'S MARIJUANA

Defendant further contends that the prosecution committed error by incorporating the marijuana retrieved from King's motorcycle in the amount used to charge defendant. King testified that he possessed one-quarter ounce of marijuana in his motorcycle saddlebag. The evidence at trial showed that at least 78 marijuana plants were confiscated from defendant's residence, in addition to 578.6 grams of processed marijuana in various types of containers. Defendant fails to explain how, or to cite any authority to suggest that, the inclusion of the minimal amount of King's marijuana within the overall quantity attributable to defendant denied him a fair trial, particularly given the elicitation of testimony acknowledging King's ownership of the minimal portion that belonged to him. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *Kelly*, 231 Mich App at 640-641. The jury was made aware of this discrepancy and defendant fails, in any manner, to demonstrate or substantiate that the reduction in the amount of confiscated marijuana by one-quarter ounce, given the amount actually attributable to defendant, would serve to negate the drug charges or be so prejudicial to defendant that he was denied a fair trial.

## D. USE OF CIRCULAR SAW

Defendant also alleges misconduct by the prosecution in demonstrating the operation of the circular saw during rebuttal closing argument. The prosecution contends that demonstration of the saw was in response to closing arguments by defense counsel that the boys were not truthful regarding their fear following threats made while in defendant's basement. Defense counsel moved for a mistrial following the prosecution's running of the saw during rebuttal closing argument. Defense counsel admitted to a delay in objecting to the prosecution's use of the saw based on uncertainty that the prosecution "was going to do anything more than show the saw to the jury." The trial court rejected defense counsel's request for a mistrial.

"Where there is no allegation that prosecutorial misconduct violated a specific constitutional right, a court must determine whether the error so infected the trial with unfairness as to make the resulting conviction a denial of due process of law." *People v Blackmon*, 280

Mich App 253, 262; 761 NW2d 172 (2008). The prosecution was permitted, during trial, to briefly demonstrate the circular saw. During rebuttal argument, the prosecution again plugged the saw into an outlet and ran it briefly in response to argument by defense counsel seeking to minimize the effect of defendant's behavior on the boys. In general, prosecutors are afforded "great latitude regarding their arguments and conduct during closing argument." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (citation omitted). In this case, there is nothing to suggest that the brief repetition of the sound of the saw for the jury was so unfair that it deprived defendant of his right to due process, particularly given the plethora of evidence and testimony regarding the events that occurred in defendant's residence and the treatment of the boys. In addition, because defendant has failed to suggest that the trial court erred in admitting the saw and permitting the prosecution to demonstrate the saw to the jury during trial, it cannot be shown that the prosecution's reference to, or re-demonstration of, the saw during rebuttal closing argument comprised prosecutorial error or misconduct. Prosecutors "are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *Id*. at 282 (citation omitted).

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next asserts a plethora of alleged failings on the part of his trial counsel constituting ineffective assistance at trial. "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. *People v Johnson*, 293 Mich App 79, 90; 808 NW2d 815 (2011).

Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20; *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984); *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). To establish that a defendant's trial counsel was ineffective, it must be demonstrated that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for the errors committed by counsel, the result of the proceedings would have been different. *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012). Effective assistance of counsel is presumed, and a defendant bears a heavy burden of proving otherwise. *Vaughn*, 491 Mich at 670. There also exists a strong presumption that the assistance provided by counsel constituted sound trial strategy. *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011). Decisions pertaining to what evidence to present and which issues to raise during closing argument are presumed to be matters of trial strategy. *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

Defendant contends that his trial counsel was unprepared due to his lack of experience in criminal law. Specifically, defendant argues that trial counsel failed to (1) obtain and enforce orders for production of discovery materials and to cross-examine police regarding delay in the provision of discovery materials; (2) failed to use certain evidence in his possession to cross-examine witnesses; (3) failed to introduce evidence of defendant's compliance with the MMMA; (4) failed to elicit witness testimony regarding the boys' motive for breaking into the home; (5)

failed to submit proposed jury instructions regarding the "fleeing felon rule," the common law right to eject trespassers, and the statutory right to citizen's arrest; and (6) failed to present a "focused and coherent theory" from which the jury could find defendant not guilty.

When asserting ineffective assistance premised on counsel's unpreparedness, a defendant must demonstrate prejudice resulting from the lack of preparation. *People v Caballero*, 184 Mich App 636, 640; 459 NW2d 80 (1990). The lack of experience of a trial counsel, standing alone, does not establish ineffective assistance. *Kevorkian*, 248 Mich App at 415. Further, a claim of ineffective assistance of counsel incorporates both a performance component and a prejudice component. Both prongs must be fulfilled. *People v Reed*, 449 Mich 375, 400; 535 NW2d 496 (1995).

Although defendant asserts that counsel was ineffective for failing to enforce or procure discovery, he has failed to demonstrate that such conduct was objectively unreasonable or prejudicial. Defendant received the statements the boys made to the police months before trial began. He was permitted to obtain the cellular telephone records of the boys. How counsel used this information or data is presumed to be a matter of trial strategy that this Court will not "second guess . . . with the benefit of hindsight." *Dunigan*, 299 Mich App at 590. Similarly, the failure to use the boys' medical records at trial also comprised trial strategy as counsel may have consciously elected not to highlight or focus on the alleged injuries sustained, particularly as they were not an element of the crimes charged and may have garnered sympathy for the boys. In addition, defendant presents nothing to suggest or support that this evidence would have been exculpatory or altered the outcome of the proceedings. On appeal, defendant continues to mistakenly assert that evidence of the prior break-in of his home comprised exculpatory evidence. While there was repeated acknowledgement throughout the trial that an earlier break-in and theft had occurred involving some of the boys, defendant erroneously concludes that this prior act served as complete justification for his behavior and the treatment of the boys without any recognition of limitations on a person's right to defense of self or property. Although defendant contends that counsel's failure to secure certain discovery impaired his ability to cross examine witnesses, this is without support in the record as counsel in fact engaged in extensive cross-examination of all witnesses.

Defendant also contends that counsel was ineffective for failing to call an individual involved in the earlier break-in of defendant's home as a witness at trial, but does not submit any evidence to support his theory that this witness would have testified in the manner he suggests. Not only is the decision whether to call certain witnesses or present certain evidence generally a matter of trial strategy, *Russell*, 297 Mich App at 716, but even if we were to assume that the witness would have testified to a previous break-in at defendant's residence, that testimony would have been merely cumulative, as this was discussed and acknowledged by several witnesses at trial.

Similarly, counsel's election to not use a timeline as a demonstrative tool before the jury was trial strategy; defense counsel may have been trying to avoid any emphasis on the amount of time the boys were actually restrained in defendant's home. "A particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004).

To the extent defendant asserts that counsel failed to elicit information regarding the motives of the boys, this is unavailing as their illegal intent was not dispositive of or relevant to the crimes charged and was fully developed at trial through the testimony of the boys, who admitted that they had entered defendant's home to steal marijuana.

Defendant's claim of ineffectiveness of counsel regarding the reasons for King's agreement to testify is speculative. King was sufficiently cross examined regarding his plea agreement to enable the jury to consider his motivation and self-interest when evaluating the credibility of this witness. Defendant also faults counsel for his failure to provide the prosecution with copies of letters exchanged between King and Barbara Westerveldt, in which King implied a political motive for the prosecution. Any such suggestion by King within the letters was of questionable admissibility and relevance. There is also no record evidence to suggest that defendant's counsel had or was privy to these letters at an earlier time during the proceedings. Further, counsel had the opportunity to impeach King's testimony through cross examination regarding his plea agreement. Additional evidence pertaining to King's motivation to testify and credibility would have been merely cumulative for purposes of impeachment.

Defendant also suggests that counsel was ineffective for failing to adequately demonstrate defendant's compliance with the MMMA. Contrary to defendant's claims, counsel admitted into evidence defendant's status as a licensed grower. A police officer acknowledged that some of the marijuana confiscated from the home was in a locked cabinet. An expert was presented on defendant's behalf to establish problems with his crop, the infestation of spider mites, defendant's treatment of the problem, and the usability of the infected plants. The expert also opined that the amount of usable marijuana removed from defendant's residence was consistent with the amount permissible in accordance with his license. Although defendant contends that counsel failed to introduce sufficient evidence that his marijuana grow operation was legal, and thus hampered his ability to refute the prosecution's theory (that defendant's failure to contact the police when the boys broke into his house was due to a desire to protect his illegal or excessive drug operation), he does not explain what further evidence defense counsel should have introduced. Further, defendant contended at trial that his intent was to scare the boys and that informing their parents, rather than the police, would be an adequate and a preferable means to deal with the problem. The failure to present certain evidence will be construed as ineffective assistance of counsel only if it deprived defendant of a substantial defense. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). This has not been demonstrated. Relatedly, the assertion that trial counsel's closing argument was ineffectual cannot be sustained as decisions pertaining to what evidence to present and which issues to raise during closing argument are presumed to be matters of trial strategy. *Russell*, 297 Mich App at 716.

Finally, defendant contends that counsel was ineffective based on the failure to submit proposed jury instructions. This statement is inaccurate, as defense counsel stated on the record that he had submitted proposed instructions related to defendant's medical marijuana affirmative defense, and the trial court indicated that it had received those instructions. Defense counsel further requested that instructions on misdemeanor assault be included in the instructions for the assault charges. In addition, there were extensive discussions between counsel and the trial court regarding the instructions to be provided to the jury. Given the extensive discussions on the jury instructions, defendant provides no support for his contention that the failure, if any, of defense

counsel to submit proposed written instructions was actually detrimental to him or that approval of the jury instructions by defense counsel was insufficiently considered or ill-advised, or that additional or different instructions would have altered the outcome of the proceedings.

## VI. DOUBLE JEOPARDY

Defendant next asserts that his convictions and sentences for unlawful imprisonment and assault with a dangerous weapon[8] violate the double jeopardy clause of the United States and Michigan Constitutions, in that the alleged actions comprised a sequence of events that were one continuous transaction. To preserve appellate review of a double-jeopardy violation, a defendant must object at the trial court level. See *Meshell*, 265 Mich App at 628. Because defendant did not object on the basis of double jeopardy in the trial court, the issue is not preserved for appellate review. "A double jeopardy challenge presents a question of constitutional law that this Court reviews de novo." *People v Nutt*, 469 Mich 565, 573; 677 NW2d 1 (2004). Because defendant did not preserve this issue by raising it below, this Court's review is for plain error affecting substantial rights. *Meshell*, 265 Mich App at 628.

"The double jeopardy clauses of the United States and Michigan constitutions protect against . . . multiple punishments for the same offense." *People v Calloway*, 469 Mich 448, 450; 671 NW2d 733 (2003). Cumulative punishments do not violate double jeopardy protections if the Legislature intends to authorize cumulative punishments. *Id*. at 450-451. "The United States and Michigan Constitutions protect a person from being twice placed in jeopardy for the same offense." *Nutt*, 469 Mich at 574. Double jeopardy provides "three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *Id*.

Defendant's four convictions for assault with a dangerous weapon and concurrent four convictions for unlawful imprisonment do not infringe on double jeopardy prohibitions. Each of the assault and unlawful imprisonment charges involved distinct acts and conduct pertaining to four different individuals. To ascertain whether a defendant is being punished twice for the same offense, Michigan courts apply the *Blockburger*[9] test. *Nutt*, 469 Mich at 576. The focus of the *Blockburger* test is on the statutory elements of the charged offenses. *Id*. If each offense necessitates the proof of a fact that the other does not, the prohibition against double jeopardy is not violated, "notwithstanding a substantial overlap in the proof offered to establish the crimes." *Id*.

It is readily apparent that the elements of assault with a dangerous weapon and unlawful imprisonment comprise separate and distinct offenses and that "each [offense] requires proof of a fact that the other does not." *Nutt*, 469 Mich at 576. Specifically, the elements of assault with a deadly weapon are: "(1) an assault, (2), with a dangerous weapon, and (3) with the intent to

---

[8] Again, defendant has referred to his convictions as being for assault and battery; see n 1.

[9] *Blockburger v United States*, 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932).

injure or place the victim in reasonable apprehension of an immediate battery." *Avant*, 235 Mich App at 505. In contrast, the elements of unlawful imprisonment are: (1) restraint of an individual by "means of a weapon or dangerous instrument," (2) "the restrained person is secretly confined," and (3) the "person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony." MCL 750.349b(1). Further, this Court has recognized that "[t]wo or more separate criminal offenses can occur within the 'same transaction.' " *People v Ryan*, 295 Mich App 388, 402; 819 NW2d 55 (2012) (citation omitted). Accordingly, defendant's assertion of double jeopardy for the two offenses is without merit.

## VII. JOINT TRIAL

Defendant next contends that the trial court erred in trying defendant and Brontkowski jointly before a single jury. This Court reviews a trial court's decision regarding severing the trials of multiple defendants for an abuse of discretion. *People v Hana*, 447 Mich 325, 346; 524 NW2d 682 (1994), amended by *People v Gallina*, 447 Mich 1203; 524 NW2d 710 (1994). A trial court abuses its discretion when it chooses an outcome that is outside the range of principled outcomes. *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008).

MCR 6.121(C) provides:

> On a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant.

"Severance is mandated under MCR 6.121(C) only when a defendant provides the court with a supporting affidavit, or makes an offer of proof, that clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *Hana*, 447 Mich at 346. "The failure to make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision." *Id*. at 346-347.

There is no absolute right to separate trials and, in fact, there is a strong policy that favors joint trials. *People v Harris*, 201 Mich App 147, 152; 505 NW2d 889 (1993). Severance should be granted when only defenses are antagonistic. *Id*. Defenses are deemed to be antagonistic if it appears that one defendant "may testify to exculpate [himself or herself] and to incriminate" his or her codefendant. *Id*. at 153. Further, "defenses not only must be inconsistent, but mutually exclusive or irreconcilable." *People v Cadle*, 209 Mich App 467, 469; 531 NW2d 761 (1995) (citation omitted). In other words, the "tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other." *Hana*, 447 Mich at 349 (citations omitted). "[I]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice." *Id*. "Finger pointing by the defendants when [an aider and abettor] theory is pursued, does not create mutually exclusive antagonistic defenses." *Id*. at 360-361. Because an aider and abettor can also be held liable as a principal, both defendants can be convicted at a single trial "without any prejudice or inconsistency." *Id*. at 361.

With the exception of the drug charges against defendant, defendant and Brontkowski were charged with precisely the same crimes. The witnesses and evidence to be admitted on the shared charges did not vary between defendant and Brontkowski. Defendant and Brontkowski did not deny that the events transpired or that they participated in them. Both, however, challenged the intent element for their actions and asserted the right to defend a home against intruders. Because the defenses asserted at trial were fully consistent and in concert with one another and were neither mutually exclusive nor irreconcilable, there exists no basis or requirement for severance of the trials.

## VIII. BINDOVER

Defendant contends the trial court also erred in denying his motion to quash based primarily on the questionable credibility of the boys as witnesses and their own criminal intent in the events that transpired. He further asserts that bindover on the assault charges was in error based on the absence of any intent to do harm, asserting that the only intent demonstrated was defendant's effort to scare the boys so that he could secure information and inform their parents about their conduct. Defendant also argues that the charge of felony-firearm should be dismissed if his felony convictions are reversed on appeal. Because we find that sufficient evidence was adduced at trial to uphold defendant's convictions, we need not address his claim of an erroneous bind-over. "If a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover." *People v Wilson*, 469 Mich 1018; 677 NW2d 29 (2004). Additionally, defendant's argument regarding his felony-firearm convictions is meritless in light of our upholding of his underlying felony convictions.

## IX. JURY INSTRUCTIONS

Next, defendant cites to a plethora of statutes in asserting deficiencies in the instructions provided to the jury by the trial court, but does not identify or provide any instructions requested but not given, or indicate how they were applicable to the evidence, the theories of defendant's case, or the manner in which their omission prejudiced defendant. We thus consider this issue abandoned. *Kevorkian*, 248 Mich App at 389 (citation and quotation marks omitted). Moreover, defense counsel's verbal indication that he had no objections to the instructions as the trial court read them to the jury constitutes a waiver. *People v Kowalski*, 489 Mich 488, 505 n 28; 803 NW2d 200 (2011) (citations omitted) ("The Court of Appeals has consistently held that an affirmative statement that there are no objections to the jury instructions constitutes express approval of the instructions, thereby waiving review of any error on appeal.").

## X. INABILITY TO PRESENT A DEFENSE

Defendant also contends that the trial court precluded his ability to present a defense. To preserve an issue for appellate review, a party must object below and specify the same ground for objection that it argues on appeal. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Because defendant did not raise this issue in the lower court, it is not preserved for appellate review. Whether a defendant was deprived of his constitutional right to present a defense is reviewed de novo. *Unger*, 278 Mich App at 247. Unpreserved issues are reviewed for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). An error is plain if it is clear or obvious. *Id*. at 764. An error is

found to have affected the defendant's substantial rights if it affected the outcome of the lower court proceedings. *Id*.

It is well-established that a criminal defendant has a constitutional right to a "meaningful opportunity to present a complete defense." *People v King*, 297 Mich App 465, 473; 824 NW2d 258 (2012). A criminal defendant must be provided a meaningful opportunity to present evidence in his or her own defense. *Unger*, 278 Mich App at 249. That right is not unlimited. This Court has explained:

> The right to present a complete defense may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. Michigan, like other states, has a legitimate interest in promulgating and implementing its own rules concerning the conduct of trials. And our Supreme Court has broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Thus, an accused must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. The Michigan Rules of Evidence do not infringe on a defendant's constitutional right to present a defense unless they are arbitrary or disproportionate to the purposes they are designed to serve. [*King*, 297 Mich App at 473-474 (quotation marks and citations omitted).]

Defendant asserts that the trial court denied him the opportunity to present witnesses and evidence consistent with his claims of self-defense, defense of his home, the fleeing felon rule, the common law right to eject trespassers and the statutory right of a citizen to detain and arrest a felon. However, he fails to identify any such potential witnesses or to reference a citation to the lower court record demonstrating any such denial. Defendant also fails to provide information pertaining to the allegedly precluded evidence or testimony, or how the trial court's alleged failure to admit it hindered his ability to present a defense. Defendant provides no detailed assertions or analysis in support of his contention of error on this issue. As noted in conjunction with other of defendant's issues on appeal:

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority to sustain or reject his position. [*Kevorkian*, 248 Mich App at 389 (citation and quotation marks omitted).]

Because defendant has failed to sufficiently develop this argument or to provide any record citation in support of his claim, we find that the issue has been abandoned on appeal. See *Payne*, 285 Mich App at 195.

Further, defendant in fact argued at trial that he had the right to defend himself and his home from intruders and that he attempted to make a "citizen's arrest." Defendant has not demonstrated plain error with regard to this issue.

# XI. SCORING OF OFFENSE VARIABLES

Defendant next challenges the trial court's scoring of eight offense variables. Specifically, the trial court scored the challenged offense variables as follows: (a) OV 1 – 25 points, (b) OV 2 – 5 points, (c) OV 3 – 10 points, (d) OV 4 – 10 points, (e) OV 7 – 50 points, (f) OV 8 – 15 points, (g) OV 10 – 10 points, and (h) OV 12 – 25 points.

As delineated in *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (citations omitted):

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo.

MCL 777.31 governs the scoring of OV 1 and pertains to the aggravated use of a weapon. MCL 777.31 provides for a score of 25 points if "[a] firearm was discharged at or toward a human being or a victim was cut or stabbed with a knife or other cutting or stabbing weapon" and for a score of 15 points if "[a] firearm was pointed at or toward a victim or the victim had a reasonable apprehension of an immediate battery when threatened with a knife or other cutting or stabbing weapon." MCL 777.31(a), (c). In this case, OV 1 was initially scored at 25 points, but was adjusted by the trial court to 15 points. Testimony was elicited at trial regarding the placement of a circular saw at the throat of one of the boys and later being run in the vicinity of a boy while duct-taped. This Court in *People v Lange*, 251 Mich App 247, 256; 650 NW2d 691 (2002), examined the difference between objects "designed for the purpose of bodily assault or defense" which "carry their dangerous character because so designed and are, when employed, per se, deadly" and those objects that "are not dangerous weapons unless turned to such purpose." Both types of objects suffice as "weapons" under MCL 777.31. *Lange*, 251 Mich App at 256-257; see also *People v Brown*, 406 Mich 215, 222-223; 277 NW2d 155 (1979). In addition, testimony and evidence pertaining to other "cutting" instruments, such as a hatchet and knife, were produced at trial. Based on the manner of use by defendant and his associates of the circular saw to instill fear, coupled with the "cutting" nature of the saw, the trial court did not err in scoring 15 points on this offense variable.

OV 2 relates to the possession or use of a lethal weapon and is governed by MCL 777.32, and provides for a score of 5 points if "[t]he offender possessed or used a pistol, rifle, shotgun, or knife or other cutting or stabbing weapon." MCL 777.32(d). In scoring 5 points on OV 2 , the trial court explained, "The Court's already indicated, I'm persuaded that there was a cutting weapon used by these Defendants, even if not this Defendant in particular." Further, under an aiding and abetting theory, defendant's associate, Brontkowski, had a firearm that was displayed to the boys, in addition to a sheathed samurai sword and a hatchet possessed by King. The trial court was justified in scoring 5 points for this offense variable.

Defendant objected to the scoring of 10 points on OV 3, asserting that the trial court was improperly implying that medical treatment was sought or procured by more than one of the boys. This variable is governed by MCL 777.33, which provides for a score of 10 points if

"[b]odily injury requiring medical treatment occurred to a victim." MCL 777.33(d).The lower court record established that one of the boys was transported by his mother to Macomb Hospital. Another of the boys was also reportedly transported to the hospital in an ambulance after police arrived. Sufficient evidence existed to support the trial court's scoring on this offense variable.

Defendant also challenges the trial court's scoring of 10 points for OV 4, which pertains to the psychological injury to a victim. MCL 777.34. MCL 777.34(a) provides for a score of 10 points if "[s]erious psychological injury requiring professional treatment occurred to a victim." In scoring 10 points on this variable, the trial court noted that at trial one of the boys testified that he was in counseling for PTSD and that he was experiencing problems with increased anger and memory, and another asserted that he had also consulted a therapist. Sufficient evidence was presented to support the trial court's scoring of this variable.

Defendant also objected to the scoring of 50 points on OV 7 at sentencing. MCL 777.37 pertains to "aggravated physical abuse." MCL 777.37(1)(a) provides for a score of 50 points if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." In scoring 50 points on OV 7, the trial court stated that "that last category [conduct designed to substantially increase the fear and anxiety a victim suffered during the offense] appears to apply on all force [sic] with what the jury found in this case." In this case, defendant and his associates blindfolded and duct-taped the boys and made verbal threats accompanied by the sounds of a circular saw in addition to striking the boys with fists, a sheathed sword, and a hatchet. The use of the circular saw is akin to the racking of a shotgun as discussed in *Hardy* in the scoring of 50 points on OV 7, as a mechanism to "substantially increase the fear of [a] victim beyond the usual level that accompanies" a crime, "to the point where the victim feared imminent death." *Hardy*, 494 Mich at 445. Two of the boys lost control of their bodily functions during the events and threats that occurred in defendant's residence. Several of the boys testified to being placed in sufficient fear to evoke crying and screaming. Two indicated that there were additional threats to sever their toes or fingers, by virtue of the grabbing of their extremities while some form of tool or implement was shown, and by the use of a saw in conjunction with verbal threats. As such, the trial court did not err in the scoring of this offense variable.

Defendant also objected to the scoring of 15 points for OV 8. MCL 777.38(1)(a) provides for a score of 15 points when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." At sentencing, defendant argued that there was no asportation of the boys, citing the short time period they were restrained in the home. In scoring 15 points, the trial court referenced the seizure of one of the boys from the porch and his forceful asportation to the basement. Further there was evidence of physical restraint of the boys while they were threatened and struck with fists and other implements, after having been moved to, and after having their egress prevented from, the basement of the residence. As such, the scoring of 15 points for OV 8 was appropriate.

Defendant challenged the scoring of 10 points on OV 10, suggesting that the boys were "almost adults . . . who put up quite a struggle in this." In accordance with MCL 777.40(1)(b), 10 points are to be scored for OV 10 when "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused

-24-

his or her authority status." MCL 777.40(3)(b) defines "exploit" as the "manipulat[ion] of a victim for selfish or unethical purposes." "Abuse of authority status" is defined to "mean[] a victim was exploited out of fear or deference to an authority figure, including, but not limited to, a parent, physician, or teacher." MCL 777.40(3)(d). The juvenile status of the boys was not in dispute. As noted by the trial court, defendant's position as a parent was a factor in his "authority status" and the acts that served to sustain his conviction for extortion would fall within the "abuse of authority status."

Finally, defendant objects to the scoring of 25 points for OV 12. In accordance with MCL 777.42(1), this offense variable is scored for contemporaneous felonious criminal acts. A score of 25 points is assessed if three or more contemporaneous crimes against a person were committed, MCL 777.42(1)(a). For an act to be deemed contemporaneous it must have "occurred within 24 hours of the sentencing offense" and "not result in a separate conviction." MCL 777.42(2)(a)(*i*), (*ii*). Defendant was convicted of extortion, four counts of unlawful imprisonment, four counts of assault with a dangerous weapon, felony-firearm, and two drug offenses. There is no evidence or explication by the trial court that defendant undertook separate felonious acts within the requisite time frame, for which there was no separate conviction, as defendant's sentencing included all acts in the commission of the crimes charged and resulted in convictions. "[T]he language of OV 12 clearly indicates that the Legislature intended for contemporaneous felonious criminal acts to be acts other than the sentencing offense and not just other methods of classifying the sentencing offense." *People v Light*, 290 Mich App 717, 726; 803 NW2d 720 (2010). Consequently, the scoring of this offense variable was error. Resentencing is not required, however, as the removal of 25 points from defendant's OV score does not alter the minimum guidelines range. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

## XII. DOWNWARD DEPARTURE

Defendant also contests as error the trial court's failure to grant his request for a downward departure in sentencing. This Court reviews for clear error a trial court's determination of whether a particular factor for departure exists. *People v Smith*, 482 Mich 292, 300; 754 NW2d 284 (2008).

At sentencing, defendant sought a downward departure from his recommended guidelines range, premised on his earlier lack of a criminal record, his standing in the community and history of employment and charity, his cooperation with police, and his conduct throughout trial. The trial court reviewed the testimony and evidence elicited at trial and discussed issues of credibility pertaining to the boys and the defenses asserted. Although the trial court denied the departure request, it found it appropriate to sentence defendant near the "bottom of the guidelines."

The Michigan Sentencing Guidelines generally require a trial court to impose a minimum sentence that falls within the sentencing guidelines range. MCL 769.34(2); *People v Buehler*, 477 Mich 18, 24; 727 NW2d 127 (2007). "A court may depart from the appropriate sentence range established under the sentencing guidelines . . . if the court has a substantial and compelling reason for that departure and states on the record the reasons for departure." MCL 769.34(3); *Buehler*, 477 Mich at 24. To be substantial and compelling, a reason must be

"objective and verifiable." *Smith*, 482 Mich at 299. "To be objective and verifiable, a reason must be based on actions or occurrences external to the minds of those involved in the decision, and must be capable of being confirmed." *People v Anderson*, 298 Mich App 178, 183; 825 NW2d 678 (2012), quoting *People v Horn*, 279 Mich App 31, 43 n 6; 755 NW2d 212 (2008). The reason or reasons given justifying the departure "must be of considerable worth in determining the length of the sentence and should keenly or irresistibly grab the court's attention. Substantial and compelling reasons for departure exist only in exceptional cases." *Smith*, 482 Mich at 299. The trial court "must justify on the record both the departure and the extent of the departure." *Anderson*, 298 Mich App at 184.

The trial court rejected defendant's request for a downward departure and, instead, sentenced defendant at the lower end of his guidelines range. The mere fact of defendant's prior, relatively unblemished criminal history was not a substantial and compelling reason for departure from the guidelines. Further, while the facts of this case are somewhat unusual, there is nothing exceptional regarding the case to justify or require a departure. The trial court explained in significant detail its reasoning and determination in sentencing, and there is no clear error demonstrated regarding the trial court's denial of defendant's request for resentencing and for a downward departure in sentencing.

## XIII. SORA REGISTRATION

Finally, defendant asserts in his supplemental brief various constitutional challenges to the trial court's requirement that he register in accordance with SORA, MCL 28.721 *et seq.*, insofar as that requirement arises from his conviction for unlawful imprisonment. Those challenges include that the required registration comprises cruel and unusual punishment under the Eighth Amendment to the United States Constitution, violates his right to due process under the Fourteenth Amendment to the United States Constitution, violates the Title-Object Clause of the Michigan Constitution, and fails the constitutionally-required rational relationship test. This Court reviews constitutional issues de novo. *People v Fonville*, 291 Mich App 363, 376; 804 NW2d 878 (2011). Similarly, this Court reviews "de novo the interpretation and application of statutes." *People v Waclawski*, 286 Mich App 634, 645; 780 NW2d 321 (2009) (citation and quotation marks omitted). "In determining whether a sentence is cruel or unusual, we look to the gravity of the offense and the harshness of the penalty, comparing the penalty to those imposed for other crimes in this state as well as the penalty imposed for the same offense by other states and considering the goal of rehabilitation." *People v Poole*, 218 Mich App 702, 715; 555 NW2d 485 (1996).

### A. RIPENESS

Initially, we address the prosecution's assertion, in its initial brief on appeal, that this issue is not ripe for appellate review, as the trial court had not yet ruled, as of that time, on defendant's motion for resentencing insofar as it related to SORA. "[I]n determining whether an issue is justiciably 'ripe,' a court must assess 'whether the harm asserted has matured sufficiently to warrant judicial intervention.' Inherent in this assessment is the balancing of 'any uncertainty as to whether defendant[ ] will actually suffer future injury, with the potential hardship of denying anticipatory relief.' " *People v Carp*, 496 Mich 440, 527; 852 NW2d 801 (2014) (citations omitted). In other words, the ripeness doctrine precludes an adjudication of a

hypothetical or contingent claim before an actual injury is incurred. See *Thomas v Union Carbide Agricultural Prod Co*, 473 US 568, 580-581; 105 S Ct 3325; 87 L Ed 2d 409 (1985). In this case, defendant's judgment of sentence required his registration under SORA. Moreover, as noted, the trial court has since ruled on defendant's motion for resentencing insofar as it related to SORA, this Court has authorized the filing of supplemental briefs on the issue, and both parties have now briefed it on appeal. This issue is therefore ripe for appellate review.

## B. STATUTORY ANALYSIS

Before addressing the constitutional issues raised in the supplemental briefs, we first address the issue of whether SORA applies at all in this circumstance, where the record reflects that there was nothing "sexual" about the conduct that led to defendant's conviction for unlawful imprisonment. We note that defendant does not argue that SORA is inapplicable; rather, defendant's argument is purely a constitutional one, i.e., that in this circumstance, the requirement that he register as a "sex offender" under SORA is constitutionally impermissible. However, we do not consider the constitutionality of a statute unless it is essential to the disposition of the case before us. *People v Higuera*, 244 Mich App 429, 441; 625 NW2d 444 (2001). Therefore, before undertaking a constitutional analysis, and in order to give that analysis context, we first address the issue as a matter of statutory interpretation and consider whether SORA, by its language, applies to the crimes for which defendant was convicted.

## 1. APPLICABLE VERSION OF SORA

We must first determine which version of SORA applies in this case. SORA requires registration by an "individual[] who [is] domiciled . . . in this state" and "who is convicted of a listed offense after October 1, 1995." MCL 28.723(1)(a). At the time defendant's offenses were committed in June 2011, an earlier version of the statute was in effect. Under that earlier version of the statute, SORA did not include as a "listed offense" a violation of MCL 750.349b (unlawful imprisonment) where the victim was a minor. See 2005 PA 301.[10]

However, SORA was amended in 2011, with an effective date of July 1, 2011. See 2011 PA 17. This amended version of the statute was in effect at the time of defendant's convictions and sentencing. Under this amended version of SORA,[11] a "listed offense" is defined by MCL 28.722(k) as comprising a "tier I, tier II, or tier III offense." In turn, MCL 28.722(s)(*iii*) defines a "Tier I offense" as including "A violation of section 349b of the Michigan penal code, 1931 PA 328, MCL 750.349b, if the victim is a minor." MCL 750.349b is the statute pertaining

---

[10] SORA did include as a "listed offense" a violation of MCL 750.349 (kidnapping), "if a victim is an individual less than 18 years of age." See 2005 PA 301 (under which MCL 28.722(e)(*vi*) then identified this listed offense). Defendant was not, however, convicted under MCL 750.349.

[11] A more recent amendment to SORA was effective on January 14, 2015. 2014 PA 328. That amendment is not pertinent to the issues raised in this appeal.

to unlawful imprisonment, and defendant has four convictions under this provision.[12] There is no dispute that the four individual victims identified in the violation by defendant of this statute were all minors, as defined by MCL 750.722(*l*) as "a victim of a listed offense who was less than 18 years of age at the time the offense was committed."[13]

Given that SORA was amended after the commission of defendant's offenses and before his conviction and sentence, we must first ascertain which version of SORA is applicable. In doing so, we find instructive the methodology employed by our Supreme Court in *People v Earl*, 495 Mich 33, 48-49; 845 NW2d 721 (2014), in construing the crime victim's rights act, MCL 780.751 *et seq*. There, the Court determined that the statute in question was "civil" and not "punitive" in nature, such that the retroactive application of a statutory amendment increasing the amount of the crime victim's rights assessment was not a violation of the ex post facto clause of the United States and Michigan Constitutions.

Similarly, SORA has been found not to be punitive in nature, but rather as also comprising a civil remedy. *People v Pennington*, 240 Mich App 188, 193-197; 610 NW2d 608 (2000); *People v Golba*, 273 Mich App 603, 617; 729 NW2d 916 (2007). Thus, registration under SORA "is governed by [the version of] the statute in effect at the time of sentencing." *People v Lueth*, 253 Mich App 670, 693; 660 NW2d 322 (2002). That version is the version adopted in 2011, with an effective date of July 1, 2011. See 2011 PA 17. Moreover, application of the 2011 version of SORA to defendant, notwithstanding that defendant's offenses were committed before its effective date, does not violate the ex post facto clause. *Pennington*, 240 Mich App at 197. We therefore hold that the trial court ultimately was correct in applying the

---

[12] The trial court's July 24, 2013 opinion and order stated that "None of Defendant's convictions are identified as a 'listed offense.'" The trial court instead determined at that time that an issue existed regarding whether defendant's conduct satisfied MCL 28.722(e)(xi), a provision within SORA that the trial court described as "a 'catch all' provision that requires registration for '[a]ny other violation of a law of this state or a local ordinance of a municipality that by its nature constitutes a sexual offense against an individual who is less than 18 years of age.'" But in so referencing MCL 28.722(e)(xi) and the "listed offenses" of SORA, the trial court apparently thus initially focused on the earlier version of SORA. As we find in this opinion, that focus was improper, as it is the 2011 version of SORA that applies in this case. The 2011 version of SORA contains an analogous "catch-all" provision within the definition of a "Tier I offense" in MCL 28.722(s)(vi). However, the parties do not argue on appeal the applicability of any "catch-all" provision, but instead properly focus on the applicability of SORA to a conviction for the "listed offense" of unlawful imprisonment, MCL 750.349b, of a minor, as set forth in the current version of SORA. The trial court, in its March 6, 2014 opinion, also properly focused on the 2011 version of SORA and its applicability to the crime of unlawful imprisonment, MCL 750.349b, of a minor.

[13] MCL 28.722(w)(*ii*) also now defines a "Tier III offense" as including "A violation of section 349 of the Michigan penal code, 1931 PA 328, MCL 750.349, committed against a minor." MCL 750.349 is the statute pertaining to kidnapping. Again, defendant was not convicted under that provision.

2011 version of SORA, and in considering its applicability to the "listed offense" of unlawful imprisonment, MCL 750.349b, where the victims were minors.

## 2. SORA'S APPLICABILITY TO NON-SEXUAL OFFENSES

Having determined that it is the 2011 version of SORA that we must apply, we must next assess the scope of its reach. Specifically, we must determine whether SORA applies where the "listed offense," which in this case is unlawful imprisonment, MCL 750.349b, of a minor, arises from conduct that the record reflects was not of a sexual nature.[14]

### a. APPLICABLE CASELAW

We initially glean some guidance from prior decisions of this Court that have upheld SORA registration requirements notwithstanding that the offense of which the defendant was convicted did not include a sexual component. In *Golba*, for example, the defendant was charged with possession of child sexually abusive material, MCL 750.145(c)(4), (which is a "listed offense" under SORA) and unauthorized access to computers, MCL 752.795, (which is not a "listed offense" under SORA). The jury convicted the defendant only of the latter charge. Since the conviction was not of a "listed offense," this Court evaluated the defendant's conviction under SORA's catch-all provision, which requires registration where the offense "by its nature constitutes a sexual offense against an individual who is less than 18 years of age." MCL 28.722(s)(vi). This Court affirmed the trial court's order that the defendant register under SORA, holding that "the underlying factual basis for a conviction governs" whether SORA's catch-all provision applies, and that whether an offense is "by its nature … a sexual offense" within the meaning of MCL 28.722(e)(xi)[15] "depends on the defendant's conduct that formed the basis for the conviction, regardless of the fact that the statute could be applied to nonsexual behavior in other circumstances." Id., 273 Mich App at 611.

---

[14] Plaintiff does not argue on appeal, nor did it argue below, that the underlying conduct was in any manner of a sexual nature. To the contrary, in responding to defendant's motion for resentencing, in which defendant had contended that "there was not the slightest hint of sexual motive in the acts charged or the crime charged," plaintiff described in detail, citing to the evidentiary record, that the underlying conduct of defendant and his associates was comprised of "torture," telling the boys that they were going to "kill them," "f--- them up," and "cut off their hands and feet," and that the boys were "doused with flammable liquid and threatened to be set on fire; had a gun pointed at their heads; threatened to have their throat, hands, and feet cut with an electric saw; hit with the back of a hatchet; and threatened to have their fingers torn off with a pliers." We are satisfied from our review of the parties' briefing and the evidentiary record below that there was no basis for requiring SORA registration pursuant to SORA's "catch-all" provision, and that we instead must evaluate whether SORA registration was proper solely based on defendant's conviction of the "listed offense" of false imprisonment, MCL 750.349b, of a minor.

[15] As noted earlier in this opinion, the "catch-all" provision was formerly denominated as MCL 28.722(e)(xi).

-29-

Similarly, in *People v Lee*, 288 Mich App 739; 794 NW2d 862 (2010), rev'd on other grounds 489 Mich 289; 803 NW2d 165 (2011), the defendant was charged with second-degree criminal sexual conduct and second-degree child abuse with sentence enhancement as a fourth-offense habitual offender. The underlying conduct involved flicking the penis of a neighbor's three-year-old child to get his attention while attempting to diaper and dress him. The defendant pleaded *nolo contendere* to third-degree child abuse as a second-offense habitual offender. Third-degree child abuse was not a specified "listed offense" under SORA. The defendant's conduct was therefore evaluated under the "catch-all" provision then denominated as MCL 28.722(e)(xi). The original trial court judge did not decide that question; instead, the trial court issued a judgment of sentence that did not require registration under SORA and left open the question of SORA registration pending the subsequent taking of testimony on the issue. Approximately 20 months later, a second trial court judge held a hearing on the issue, and ruled that SORA registration was required. This Court affirmed. Citing *Golba* and *People v Althoff*, 280 Mich App 524, 534; 760 NW2d 764 (2008), this Court in *Lee* held that "the particular facts of a violation, and not just the elements of the violation, are to be considered." *Lee*, 288 Mich App at 745. Our Supreme Court reversed; however, it did so based solely on the trial court's procedural errors and failure to follow the requirements of the statute; it did not otherwise disturb the holding of this Court. *Lee*, 489 Mich at 297-301.

This caselaw is instructive, in that it demonstrates that SORA registration may be required even where the offense requiring registration is not necessarily itself of a sexual nature. The Courts instead determined, in the circumstances presented, that it was appropriate to consider the underlying factual basis for the conviction, which in those cases—unlike in this case—did involve conduct of a sexual nature. However, those cases do not answer the precise question before us, since the defendant's convictions in those cases were not of a "listed offense," and since the Courts therefore were obliged to construe SORA's "catch-all" provision to determine whether the underlying conduct "by its nature constitutes a sexual offense against an individual who is less than 18 years of age." MCL 28.722(e)(xi).

The catch-all provision is not at issue in this case. Therefore, we need not construe the statutory language of that provision to make such an assessment. Rather, the issue before us is whether defendant's conviction of a "listed offense" requires him to register under SORA even though the record reflects that the underlying conduct was not sexual in nature. In other words, must "listed offenses," like those falling within the catch-all provision, be sexual in nature?

This Court addressed that question to some extent in *Fonville*, and upheld a defendant's required registration under SORA for the offense of child enticement, MCL 750.350, a listed Tier III offense. MCL 28.722(w)(*iii*). *Fonville*, 291 Mich App at 379-380.[16] The defendant in that case pleaded guilty to child enticement after failing to return children who had been voluntarily placed in his care, and after instead keeping them with him in his vehicle while he and his friend drove around under the influence of alcohol and drugs. *Id*. at 367-368. This Court

---

[16] The *Fonville* panel analyzed defendant's challenge to his SORA registration with relation to a previous version of the statute; however in both versions, child enticement is a listed offense.

noted that "the offense of child enticement includes no express sexual component as a requirement for a conviction of the offense." *Id*. at 380. Yet, the *Fonville* Court concluded that "the Legislature has nevertheless deemed registration for those convicted of that crime to be a necessary measure to protect the safety and welfare of the children of this state. And in that case, Fonville admitted that his conduct, while not sexual in nature, 'endangered two young kids[.]' " *Id*. Similarly, here, defendant's conduct definitely endangered his minor victims.

*Fonville* thus directs our conclusion that where, as here, a defendant is convicted of a "listed offense," SORA applies even though the underlying conduct is not sexual in nature. Because the rationale for the Court's conclusion in *Fonville* may not be readily apparent, however, we find it helpful to delve into the statutory basis that we believe resulted in the conclusion reached in *Fonville*.

### b. STATUTORY BASIS

The starting point of our statutory analysis is, as always, with the language of the statute itself. The "short title" of SORA is the "sex offenders registration act." MCL 28.721. While that description is not dispositive in and of itself, see *HJ Tucker & Assoc, Inc v Allied Chucker & Engineering Co*, 234 Mich App 550, 557; 595 NW2d 176 (1999), the short title of SORA thus suggests that it serves to require that only "sex offenders" must register under the act. Unfortunately, SORA does not itself define the term "sex offender."

However, in enacting 2011 PA 17, the Michigan Legislature described SORA, by its then-existing long-form title, as follows:

> AN ACT to require persons convicted of *certain offenses* to register; to prohibit certain individuals from engaging in certain activities within a student safety zone; to prescribe the powers and duties of certain departments and agencies in connection with that registration; and to prescribe fees, penalties, and sanctions. [2011 PA 17 (emphasis added).][17]

See also *People v Dowdy*, 489 Mich 373, 379-380; 802 NW2d 239 (2011) ("SORA is a conviction-based registration statute that requires individuals convicted of certain 'listed offenses' to register as sex offenders.") While arguably counter-intuitive, the term "sex offender," under a broad reading of this language, would derive its meaning from the satisfaction of the specified condition; that is, persons who are convicted of "certain offenses" that are "listed offenses" under SORA are, by definition, "sex offenders," regardless of the nature of the offense.

---

[17] Certain elements of this long-form title, which are not pertinent to this part of our analysis, were added after the initial enactment of SORA in 1994. The original long-form title of SORA, as enacted in 1994, was "An act to require persons convicted of certain offenses to register; to prescribe the powers and duties of certain departments and agencies in connection with that registration; and to prescribe penalties and sanctions." 1994 PA 295.

SORA describes its legislative purpose as follows:

> The legislature declares that the sex offenders registration act was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger. [MCL 28.721a]

The first sentence of this provision speaks of "preventing and protecting against the commission of future criminal sexual acts *by convicted sex offenders*." *Id*. (emphasis added). Arguably, this language again suggests an intent that SORA apply only to those who have been convicted of crimes of a sexual nature. However, reading this sentence in the overall context of the provision arguably again supports the conclusion that the term "sex offender" merely means "a person who has been convicted of committing an offense covered by this act," *id*., whom the Legislature has determined to therefore be a person who poses the described potential danger.

### c.  HISTORICAL CONTEXT

We glean some further guidance from the fact that the 2011 amendment to SORA, as set forth in 2011 PA 17, was enacted in order to bring Michigan into compliance with the federal Sex Offender Registration and Notification Act (SORNA), 42 USC 16901 *et seq*. SORNA was enacted as a component of the Adam Walsh Child Protection and Safety Act of 2006, Pub L No 109-248, 120 Stat 587 (July 27, 2006), and establishes "a comprehensive national system" for the registration of sex offenders, and which among other things required states to separate sex offenders according to three tiers of listed offenses. 42 USC 16901; *United States v Lafferty*, 608 F Supp 1131, 1138 (D SD 2009). We initially note that while SORNA established a "Sex Offender Registration and Notification Program," 42 USC 16902, it more broadly declared its purpose to be the protection of the public from "sex offenders and offenders against children." 42 USC 16901. Moreover, unlike SORA, the federal SORNA legislation defines the term "sex offender" and, correspondingly defines the term within the context of each of the three tiers of listed offenses. "The term 'sex offender' means an individual who was convicted of a sex offense." 42 USC 16911(1). While that verbiage again suggests that the offense must be of a sexual nature, closer inspection of SORNA reveals a definition of "sex offense" as including both:

> (i) a criminal offense that has an element involving a sexual act or sexual contact with another;

> (ii) a criminal offense that is a specified offense against a minor. [42 USC 16911(5).]

The fact that those two alternative components of a "sex offense" stand in contradistinction to each other, and yet both constitute a "sex offense," compels the conclusion that a "criminal offense that is a specified offense against a minor" need not necessarily "ha[ve] an element involving a sexual act or sexual contact with another." See *United States v Mi Kyung Byun*, 539 F3d 982, 987 (CA 9, 2008), cert den 555 US 1088, 129 S Ct 771, 172 L Ed 2d 761 (2008) ("Because we hold Byun committed a sex offense under § 16911(5)(A)(ii), we do not address whether Byun's crime qualifies as a sex offense under § 16911(5)(A)(i)."). To read the provision otherwise would render certain of its language surplusage, which is not permitted. *People v Peltola*, 489 Mich 174, 181; 803 NW2d 140 (2011). Moreover, the term "specified offense against a minor" is defined to mean "an offense against a minor that involves any of" a number of specified offenses or activities. 42 USC 16911(7). Many of the specified activities involve conduct of an inherently sexual nature: solicitation to engage in sexual conduct; use in a sexual performance; solicitation to practice prostitution; video voyeurism; possession, production, or distribution of child pornography; criminal sexual conduct involving a minor; and any conduct that by its nature is a sex offense against a minor. 42 USC 16911(7)(C), (D), (D), (F), (G), (H), (I). However, other of the specified activities involve conduct that is not necessarily sexual in nature, provided that it is an offense against a minor: an offense involving kidnapping; and an offense involving false imprisonment. 42 USC 16911(7)(A), (B); see also *Mi Kyung Byun*, 539 F 3d at 992.

42 USC 16912(a) requires that "[e]ach jurisdiction shall maintain a jurisdiction-wide sex offender registry conforming to the requirements of this title." "Jurisdiction" is defined to include "[a] State." 42 USC 16911(10)(A). Michigan was therefore obliged to amend SORA to conform to the requirements of SORNA. It did so in 2011 with the enactment of 2011 PA 17.

42 USC 16912(b) provides that the United States Attorney General "shall issue guidelines and regulations to interpret and implement this title." In accordance with that directive, the United States Department of Justice, Office of Justice Programs adopted The National Guidelines for Sex Offender Registration and Notification in July 2008. See 73 FR 38030. Consistent with SORNA's requirement that states "conform[] to the requirements" of the federal legislation, 42 USC 16912(a), the guidelines confirm that "SORNA establishes a national baseline for sex offender registration and notification programs. In other words, the Act generally constitutes a set of minimum national standards and sets a floor, not a ceiling, for jurisdictions' programs." 73 FR at 38046.

Consequently, given that SORNA expressly includes kidnapping and false imprisonment as "specified offense[s] against a minor" that, as such, by definition constitute "sex offense[s]" requiring registration, Michigan was obliged to conform to that minimum national standard by similarly including within SORA the crimes of kidnapping and unlawful imprisonment against a minor, MCL 750.349, MCL 750.349b.[18]

---

[18] The federal guidelines confirm that "[t]he relevant offenses are those whose gravamen is abduction or unlawful restraint of a person, which go by different names in different jurisdictions, such as 'kidnapping,' 'criminal restraint,' or 'false imprisonment.' Jurisdictions

Given this backdrop and context, we hold, from a statutory interpretation perspective, that the reach of SORA extends generally to the offense of unlawful imprisonment where the victim is a minor, without regard to whether the underlying conduct was in any way sexual in nature.[19]

## C. CONSTITUTIONAL CHALLENGES

We now turn to defendant's constitutionally-based challenges to his required registration under SORA, and find them unavailing.[20] The party challenging the constitutionality of a statute has the burden of proving the law's invalidity. *People v Sadows*, 283 Mich App 65, 67; 768 NW2d 93 (2009). When evaluating the constitutionality of a statute, we presume statutes are constitutional and "exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to a conflict." *Phillips v Mirac, Inc*, 470 Mich 415, 422; 685 NW2d 174 (2004). We indulge "every reasonable presumption" in favor of a statute's validity. *Id*. at 423. A statute is not unconstitutional merely because it is appears "undesirable, unfair, unjust, or inhumane" nor because it appears that the statute "is unwise or results in bad policy." *People v Boomer*, 250 Mich App 534, 538; 655 NW2d 255 (2002). Such arguments should be addressed to the Legislature. *Id*. Rather, we will construe a statute as constitutional unless its unconstitutionality is "clearly apparent." *People v Harper*, 479 Mich 599, 621; 739 NW2d 523 (2007), cert den 552 US 1232 (2008). This presumption is so strong it may justify a narrow construction or "a construction against the natural interpretation of the statutory language." *People v Malone*, 287 Mich App 648, 658; 792 NW2d 7 (2010).

### 1. CRUEL AND UNUSUAL PUNISHMENT

Defendant first argues that SORA registration is cruel and unusual punishment under the Eighth Amendment to the United States Constitution insofar as it applies to a conviction for

---

can implement the offense coverage requirement of these clauses by requiring registration for persons convicted of offenses of this type (however designated) whose victims were below the age of 18. It is left to jurisdictions' discretion under these clauses whether registration should be required for such offenses in cases where the offender is a parent or guardian of the victim." 73 FR at 38051. In Michigan, the crime of false imprisonment is denominated "unlawful imprisonment," 750.349b. The fact that the guidelines recognize states' discretion over whether registration for this offense should be required where the offender is a parent or guardian of a victim (which is not required under SORNA) demonstrates that states do not otherwise have discretion over whether to require registration for this offense.

[19] For all of these reasons, we similarly decline to interpret the language of SORA's catch-all provision ("[a]ny *other* violation … that by its nature constitutes a sexual offense against a persons who is less than 18 years of age"), MCL 28.722(e)(xi) (emphasis added), to limit all "listed offenses" under SORA to those that by their nature constitute sexual offenses, but instead interpret it to more broadly mean other violations of law, provided that the specified conditions are satisfied.

[20] In its supplemental brief on appeal, plaintiff only addresses defendant's argument that SORA registration constitutes cruel and unusual punishment on these facts.

unlawful imprisonment.[21]  The trial court did not address this aspect of defendant's argument. However, this Court has expressly held that the SORA registration requirement does not constitute cruel and unusual punishment even when the underlying offense has no sexual component.  See *Fonville*, 291 Mich App at 380-381.  We are bound by that decision. MCR 7.215(C)(2).  Moreover, this Court has consistently ruled that SORA's registration requirement, as applied to adult offenders, does not constitute punishment and is, instead, structured or focused on the protection of the public.  *Pennington*, 240 Mich App at 193-197. This is confirmed by the above-quoted purpose underlying SORA, as reflected in MCL 28.721a.

Specifically, SORA has been construed not to be punitive, but to constitute "a remedial regulatory scheme furthering a legitimate state interest."  *Golba*, 273 Mich App at 617 (citations omitted).  "In sum, . . . any detrimental effects of SORA on sex-offender registrants were not so significant as to warrant finding that the act imposed a criminal penalty affecting constitutional rights."  *Id*. (citations omitted).  Quite recently this Court has reaffirmed this conclusion:

> In sum, the relevant . . . factors indicate that the SORA does not impose punishment as applied to defendant.  The SORA has not been regarded in our history and traditions as punishment, the SORA does not impose affirmative disabilities or restraints, it does not promote the traditional aims of punishment, and the SORA has a "rational connection to a nonpunitive purpose" and is not excessive with respect to this purpose.  Defendant therefore has failed to show "by the clearest proof" that the SORA is "so punitive either in purpose or effect" that it negates the Legislature's intent to deem it civil.  Accordingly, as applied to defendant, the SORA does not violate the Ex Post Facto Clause or amount to cruel or unusual punishment because it does not impose punishment.  [*People v Temelkoski*, 307 Mich App 241, 270; ___ NW2d ___ (2014) (citations omitted).]

Accordingly, we reject defendant's contention that the requirement that he register under SORA constitutes cruel and unusual punishment.

## 2.  DUE PROCESS/RATIONAL RELATIONSHIP

Defendant next argues that his registration under SORA violates his right to due process of law and, in a separate subheading, argues that SORA is not rationally related to any governmental interest.  As discussed below, and although defendant has woefully developed this argument, we conclude that defendant appears to raise a vague-as-applied due process claim as well as a substantive due process claim; we find both of these claims unavailing.

---

[21] Michigan's constitution prohibits "cruel *or* unusual punishment" and has been interpreted as providing broader protection than its federal counterpart.  See Const 1963, art 1, § 16; see also *People v Bullock*, 440 Mich 15, 30; 485 NW2d 886 (1992).  Defendant does not argue that his SORA registration is prohibited by the Michigan Constitution; even if he had done so, it would not alter our analysis.

The United States and Michigan constitutions require that no one may be deprived of life, liberty or property without due process of law. US Const, Am V; US Const, Am XIV; Const 1963, art 1, § 17; *Elba Twp v Gratiot County Drain Comm'r*, 493 Mich 265, 288; 831 NW2d 204 (2013); *People v Bearss*, 463 Mich 623, 629; 625 NW2d 10 (2001). Michigan's due process clause is construed no more broadly than its federal equivalent. *People v Sierb*, 456 Mich 519, 523-524; 581 NW2d 219 (1998).

Due process claims may be procedural or substantive. Procedural due process involves the fairness of the procedures used by the state to deprive a person of life, liberty, or property. *In re Parole of Hill*, 298 Mich App 404, 412; 827 NW2d 407 (2012). With regard to criminal statutes, procedural due process is generally satisfied by reasonable notice of the charge and an opportunity to be heard and present a defense. *In re Oliver*, 333 US 257, 273; 68 S Ct 499; 92 L Ed 682 (1948); *People v Eason*, 435 Mich 228, 233; 458 NW2d 17 (1990); *People v Aspy*, 292 Mich App 36, 48-49; 808 NW2d 569 (2011). By contrast, the right to substantive due process bars "certain government actions regardless of the fairness of the procedures used to implement them." *Co of Sacramento v Lewis*, 523 US 833, 840; 118 S Ct 1708, 140 L Ed 2d 1043(1998); *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 196; 761 NW2d 293 (2008). A substantive due process challenge may be facial or "as applied." A facial challenge to a statute may be upheld only if the challenger demonstrates that there is no application of the statute that is constitutional. See *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). A statute may also be challenged on the grounds that it is unconstitutional "as applied" to the challenger, notwithstanding that some applications of the statute may be constitutionally sound. See *Troxel v Granville*, 530 US 57, 69-71; 120 S Ct 2054; 147 L Ed 2d 49 (2000).

Within the realm of due process claims, a statute may also be challenged as void for vagueness. *Ray Twp v B & BS Gun Club*, 226 Mich App 724, 731; 575 NW2d 63 (1997). A statute is constitutionally vague if it does not provide "fair notice of the conduct it regulates" and gives "the trier of fact unstructured and unlimited discretion in determining whether the statute has been violated." *Id*.; see also *People v Loper*, 299 Mich App 451, 458; 830 NW2d 836 (2013). Vagueness challenges that do not involve First Amendment freedoms must be examined in light of the facts of the particular case. *People v Lino*, 447 Mich 567, 575; 527 NW2d 434 (1994); *People v Dillon*, 296 Mich App 506, 510; 822 NW2d 611 (2012). The challenged statute must be construed with reference to the entire act to determine whether the requisite certainty exists. *People v Hayes*, 421 Mich 271, 284; 364 NW2d 635 (1984).

Although defendant does not develop his argument, we conclude that his reference to a lack of a rational relationship to a legitimate governmental interest in the Legislature's addition of the crime of unlawful imprisonment (of a minor) to SORA is effectively a substantive due process challenge. Procedural due process challenges to SORA generally center on the damage to a registrant's reputation from being listed on a public sex offender registry, and the argument that prior to such registration a potential registrant must be granted notice and the opportunity to be heard and present a defense. In analyzing Connecticut's sex offender registration statute, the Supreme Court of the United States held that procedural due process concerns were not implicated by the requirement of registration where "the law's requirements turn on an offender's conviction alone—a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest." *Conn Dep't of Public Safety v Doe*, 538 US 1, 7-8; 123 S Ct 1160; 155 L Ed 2d 98 (2003). Based on this reasoning, the Sixth Circuit has held that sex

offender registration does not violate procedural due process when, as in Michigan, registration is based "solely on the fact of an offender's conviction" and requires no additional individual determinations for which an offender should receive notice and an opportunity to be heard. See *Fullmer v Mich Dep't of State Police*, 360 F 3d 579, 582 (CA 6, 2004).[22] Further, this Court has determined that SORA registration does not implicate a deprivation by the state so as to trigger procedural due process protections, because damage to registrants' reputations as a result of registration is both "speculative" and flows "most directly from plaintiffs' own convicted misconduct and from private citizens' reaction thereto, and only tangentially from state action." *In re Tiemann*, 297 Mich App 250, 268; 823 NW2d 440 (2012). We therefore conclude that, even if defendant had meant to raise a procedural due process challenge to his SORA registration, such a challenge would be meritless.[23]

Both substantive due process challenges and challenges brought under the equal protection clause, US Const Am XIV; Const 1963, art 1, § 2 (to the extent defendant raised such challenges, albeit woefully inadequately), are subject to rational basis review (in the absence of a highly suspect category such as race, national origin, or ethnicity or a category receiving heightened scrutiny such as legitimacy or gender), i.e., the consideration of whether the legislation is rationally related to a legitimate government purpose. See *Crego v Coleman*, 463 Mich 248, 259; 615 NW2d 218 (2000). However, before reaching rational basis review in an equal protection challenge, a claimant must show that he was treated differently than other persons who were similarly situated. See *Wysocki v Kivi*, 248 Mich App 346, 367; 639 NW2d 572 (2001). In this case, defendant has not alleged that he was treated differently than other persons required to register under SORA. Thus, we conclude that defendant's rational relationship challenge to SORA's inclusion of unlawful imprisonment of minors as a "listed offense" (at least as applied to registrants who committed the offense without a sexual purpose) is essentially a substantive due process claim. See *Cummins v Robinson Twp*, 283 Mich App 677; 770 NW2d 421 (2009).

"The question whether challenged legislation violates principles of substantive due process depends on the nature of the right affected." *Brinkley v Brinkley*, 277 Mich App 23, 30; 742 NW2d 629 (2007). If the challenged legislation affects a fundamental right or involves a suspect classification, "strict scrutiny applies and a compelling state interest is required to uphold it." *Id*. If not, the rational basis test applies and this Court "examines whether the law is rationally related to a legitimate governmental purpose." *Id*.; see also *Lingle v Chevron USA, Inc*, 544 US 528, 541; 125 S Ct 2074; 161 L Ed 2d 876 (2005); *Conlin v Scio Twp*, 262 Mich App 379, 390; 686 NW2d 16 (2004).

---

[22] Decisions of federal courts of appeals, while not binding on this Court, may be persuasive. See *Abela v General Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[23] In the above cases, the courts left open the question of whether sex offender registration requirements violate *substantive* due process in light of the fact that the plaintiffs' did not assert error on that basis. *Doe*, 538 US at 8; *Fullmer*, 360 F 3d at 582; *Tiemann*, 297 Mich App at 268.

This Court has stated that the requirement of registration under SORA does not implicate a fundamental right. See *In re Wentworth*, 251 Mich App 560, 565-566; 651 NW2d 773 (2002). The Court in *Wentworth* held that SORA registration did not deprive the respondent of a fundamental liberty interest or a constitutional right to privacy. *Id*. at 555, 566. Indeed, defendant does not appear to argue that SORA registration deprived him of a fundamental right so as to trigger strict scrutiny.

Regarding rational basis review, this Court has stated:

> Under the traditional or rational basis test, a classification will stand unless it is shown to be essentially arbitrary. Stated differently, one who attacks an enactment must show that it is arbitrary and wholly unrelated in a rational way to the objective of the statute. Few statutes have been found so wanting in "rationality" as to fail to satisfy the "essentially arbitrary" test. Stated positively, the test is that courts must uphold a statutory classification where it is rationally related to a legitimate government purpose. The rational basis test reflects the judiciary's awareness that it is up to legislatures, not courts, to decide the wisdom and utility of legislation. [*Wysocki*, 248 Mich App at 354 (quotation marks, footnotes, and citations omitted).]

With regard to SORA in general, this Court has held that SORA is rationally related to a "legitimate state interest of protecting the public." See *Golba*, 273 Mich App at 927. Put another way, SORA in general is rationally related to the Legislature's stated purpose of protecting the people of this state from those who have committed offenses that pose a "potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state." MCL 28.721a; see also *Fonville*, 291 Mich App at 380; *Temelkoski*, 307 Mich App at 270 ("SORA has a rational connection to a non-punitive purpose"). However, the issue of whether the requirement of registration for offenders who commit the crime of unlawful imprisonment of a minor without a sexual purpose survives rational basis review appears to be an issue of first impression in Michigan.

Many other jurisdictions have faced similar challenges to the inclusion of false imprisonment crimes, even absent a sexual purpose, in their sex offender registration statutes.[24] The majority have upheld the statutes under rational basis review. See, e.g., *Moffit v Commonwealth*, 360 SW 3d 247, 255-258 (Ky Ct App, 2012) (rejecting the defendant's substantive and procedural due process challenges to sex offender registration for child kidnapping; although the court did find that the defendant's conduct included a sexual component, it noted that the purpose of Kentucky's registration statute was the protection of children and that the requirement of registration for certain offenses against minors, regardless of a sexual component, did not offend due process); *State v Smith*, 323 Wis 2d 377, 389, 397-403; 780 NW2d 90 (Wis 2010) (holding that requiring the defendant to register as a sex offender following his conviction for false imprisonment of a minor, despite the fact that the offense "was

---

[24] Our discussion in this opinion of such challenges in other jurisdictions is not intended to be an exhaustive one.

not of a sexual nature" was rationally related to the government interest in protecting the public and did not violate defendant's right to due process or equal protection under the law); *Rainer v State*, 268 Ga 675, 676-677; 690 SE 2d 827 (Ga, 2010) (holding that the requirement of sex offender registration for the defendant's conviction of false imprisonment of a minor was not cruel and unusual punishment and did not violate substantive or procedural due process); *People v Clintron*, 46 AD 3d 353, 354; 848 NYS 2d 616 (NY Sup Ct App Div, 2007) (upholding the trial court's determination that the requirement of sex offender registration for "certain nonsexual abduction-related crimes" is constitutional); *People v Johnson*, 225 Ill 2d 573, 591-592; 870 NE 2d 415 (Ill, 2007) (holding that the inclusion of "aggravated kidnapping of a minor by a nonparent" in the Illinois sex offender registration act was not violative of due process "regardless of whether [the offender's] conduct was sexually motivated."); *State v Sakobie*, 165 NC App 447, 453 ; 595 SE 2d 615 (NC Ct App, 2004) (upholding the defendant's required registration for kidnapping a minor during the commission of a larceny). However, this conclusion is not universal. See *ACLU of New Mexico v City of Albuquerque*, 139 NM 761, 772; 137 P 3d 1215 (2006) (stating that the defendant city's sex offender registration ordinance was constitutionally defective to the extent that it included kidnapping and false imprisonment offenses as "sex offenses" when the city's stated purpose in passing the ordinance was the "protection of victims and potential victims of sex offenses."); *State v Small*, 162 Ohio App 375, 386; 833 NE 2d 774 (Oh Ct. App, 2005) (holding that classifying the defendant as a "sexually oriented offender" after conviction for kidnapping minors without a sexual purpose, violated defendant's right to due process where the statutory definition of "sexual offender" included one who had committed certain criminal offenses against a minor regardless of sexual intent.).

Giving due deference to the standards applicable for evaluating the constitutionality of a statute, we agree with the majority of the other jurisdictions that have considered this issue. As referenced above, the Legislature has stated that it "has determined that a person who has been convicted of committing an offense covered by [SORA] poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state" and therefore has required their registration "to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger." The inclusion of persons who commit the offense of false imprisonment against minors is not "arbitrary and wholly unrelated in a rational way" to this stated purpose. *Wysocki*, 248 Mich App at 354. Although defendant asserts that the asportation (and presumably false imprisonment) of minors may occur for many non-sexual reasons, he does not explain how the fact that a crime against a minor may be committed for several reasons renders its inclusion in SORA "wholly unrelated" to SORA's purpose. *Id.*; see also *Fonville*, 291 Mich App at 380. For these reasons, we conclude that defendant's challenge to his required registration under SORA on the grounds of substantive due process must fail.

Finally, defendant's argument that SORA is constitutionally vague as applied to his offenses, and thus violates his right to due process of law, is meritless. Regardless of the validity of such an argument under the previous version of SORA, the 2011 version applicable to defendant's offenses explicitly lists the crime for which defendant was convicted as a Tier I offense and it thus both provides "fair notice of the conduct it regulates" and does not give "the trier of fact unstructured and unlimited discretion in determining whether the statute has been violated." *Ray Twp*, Mich App at 731. We decline to find SORA unconstitutionally vague, and reject defendant's due process claims. See *Harper*, 479 Mich at 621.

## 3. TITLE-OBJECT CLAUSE

We also reject defendant's challenge to the inclusion within SORA of the crime of unlawful imprisonment of a minor on the ground that it violates the Title-Object Clause of the Michigan Constitution. The Title-Object Clause provides:

> No law shall embrace more than one object, which shall be expressed in its title. No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title. [Const 1963, art. 4, § 24.]

" 'The purpose of the Title-Object Clause is to ensure that legislators and the public receive proper notice of legislative content and [to] prevent [] deceit and subterfuge.' " *Coalition Protecting Auto No-Fault v Michigan Catastrophic Claims Ass'n*, 305 Mich App 301, 314; 852 NW2d 229 (2014) (hereafter, "*CPAN*"), quoting *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 388; 803 NW2d 698 (2010) (alterations in original). " 'The constitutional requirement should be construed reasonably and permits a bill enacted into law to include all matters germane to its object, as well as all provisions that directly relate, to, carry out, and implement the principal object.' " *Id.*

"There are three ways to challenge a statute on the basis of the Title-Object Clause: [(1)] 'a "title body" challenge, (2) a multiple-object challenge, and (3) a change of purpose challenge.' " *Ray Twp*, 226 Mich App at 728, citing *Kevorkian*, 447 Mich at 453 (Opinion by CAVANAGH, J.). Defendant does not specify on which of these bases he seeks to challenge SORA. However, the gist of defendant's argument is that "embedding th[e] non-sexual offense [of unlawful imprisonment of a minor] deep within the long list of sexual offenses" does not provide "fair notice to the public of the purpose of the act through its title." Further, defendant suggests that "[i]f … the legislature's purpose was to expand the nature of offenses for which registration is to be required, the title of the Act must so reflect, so as to give reasonable notice to the public." We therefore conclude that defendant seeks to bring a "title body" challenge, and perhaps also a "change of purpose" challenge.

## a. TITLE BODY CHALLENGE

To the extent that defendant brings a "title body" challenge, he must demonstrate "that the title of [SORA] does not adequately express its contents," *Ray Twp*, 226 Mich App at 728, such that "the body exceeds the scope of the title." *CPAN*, 305 Mich App at 314 (quotation and citation omitted). "The title of an act must express the general purpose or object of the act. . . . However, the title of an act is not required to serve as an index to all of the provisions of the act. . . . Instead, the test is whether the title gives the Legislature and the public fair notice of the challenged provision." *Ray Twp*, 226 Mich App at 728 (citations omitted). "The fair-notice requirement is violated only 'where the subjects [of the title and body] are so diverse in nature that they have no necessary connection . . . .' " *CPAN*, 305 Mich App at 315, citing *People v Cynar*, 252 Mich App 82, 85; 651 NW2d 136 (2002).

Defendant fails to satisfy this test, or therefore to overcome the presumption of constitutionality. *Phillips*, 470 Mich at 422. Initially, defendant fails to adequately address what

-40-

the "title" of SORA is, or how it relates to the "contents" or "general purpose or object" of the act. Defendant instead merely declares that "the inclusion of a person convicted of a non-sexual unlawful imprisonment offense in the list of offenders required to register under legislation *entitled* Sexual Offender Registration Act violates the title-object requirement of the Michigan Constitution." (emphasis added). Arguably implicit within that declaration is the argument that the "title" of SORA is "Sexual Offender Registration Act,"[25] and that that title does not adequately express the content of SORA to the extent it applies to non-sexual acts.

However, as noted earlier in this opinion, and as defendant fails to recognize, "sex offenders registration act" is merely the "short title" of SORA. MCL 28.721. Its "title" reads as follows:

> AN ACT to require persons convicted of *certain offenses* to register; to prohibit certain individuals from engaging in certain activities within a student safety zone; to prescribe the powers and duties of certain departments and agencies in connection with that registration; and to prescribe fees, penalties, and sanctions. [Act 295 of 1994 (emphasis added).]

The title of SORA thus nowhere refers, or limits SORA's application, to "sexual" offenses; instead it broadly provides that SORA applies to "certain offenses," which then are identified in the body of the act as "listed offenses," one of which is unlawful imprisonment, MCL 750.349b, of a minor. The title of SORA therefore "adequately express[es] its contents," "express[es] the general purpose or object of the act," and "gives the Legislature and the public fair notice of the challenged provision." *Ray Twp*, 226 Mich App at 728. It thus "cannot be said that the title and the body of the act are so 'diverse in nature that they have no necessary connection' between each other." *CPAN*, 305 Mich App at 316 (citation omitted).[26] Accordingly, defendant's title-body challenge fails.

### b. CHANGE OF PURPOSE CHALLENGE

Defendant additionally argues, without explanation, that "[i]f . . . the legislature's purpose was to expand the nature of offenses for which registration is to be required, the title of the Act must so reflect, so as to give reasonable notice to the public." To the extent that

---

[25] In so describing SORA, defendant mis-identifies the Legislature's denomination of SORA, which is as the "sex offenders registration act." MCL 28.721.

[26] Defendant's position essentially boils down to challenging the "short title" of SORA as inadequately expressing the statute's contents. Indeed, as discussed later in this opinion, there arguably is a degree of ambiguity or vagueness in SORA's short title that may give rise to a perception of injustice in applying SORA in certain circumstances. However, a statute's "short title" is not the proper subject of a title-object challenge. A title-object challenge focuses on a statute's actual title. Defendant accordingly does not raise a proper challenge under the Title-Object Clause. Moreover, for the reasons stated in this opinion, any such challenge would fail.

-41-

defendant, by this language, seeks to raise a "change of purpose" challenge to SORA under the Title-Object Clause, his challenge again fails.

Defendant's assertion appears to suggest that, in amending SORA in 2011 to in part add the crime of unlawful imprisonment, MCL 750.349b, of a minor, as a "listed offense," the Michigan Legislature was required to "so reflect" in the "title" of the act that it had "expand[ed] the nature of offenses for which registration is to be required." Conceivably, defendant might also maintain that prior amendments to SORA that added other "listed offenses" of a non-sexual nature (e.g., kidnapping of a minor) also needed to be reflected in the title of the act; defendant does not, however, develop this argument. "A determination whether an amendment or substitute act changed the original purpose depends on whether the subject matter of the amendment or substitute was germane to the original purpose." *Boulton v Fenton Twp*, 272 Mich App 456, 466; 726 NW2d 733 (2007), citing *Cynar*, 252 Mich App at 86.

To determine whether 2011 PA 17 changed SORA's original purpose, we must first ascertain what the original purpose of SORA was, and more specifically what its purpose was before the 2011 amendment, and then analyze whether the 2011 amendment changed that purpose. As noted earlier in this opinion, SORA was enacted in 1994, at which time the Legislature described it as follows:

> "An act to require persons convicted of *certain offenses* to register; to prescribe the powers and duties of certain departments and agencies in connection with that registration; and to prescribe penalties and sanctions." [1994 PA 295 (emphasis added).]

That descriptive title has been—and remains—unchanged in all respects that are material to our analysis. Since 2006, SORA's title has read as follows:

> AN ACT to require persons convicted of *certain offenses* to register; to prohibit certain individuals from engaging in certain activities within a student safety zone; to prescribe the powers and duties of certain departments and agencies in connection with that registration; and to prescribe fees, penalties, and sanctions. [2011 PA 17 (emphasis added).[27]]

The title of SORA thus has not materially changed since its original enactment in 1994. It has always provided that "persons convicted of certain offenses" were required to register.

What has changed since SORA's enactment in 1994 is the definition of the "certain offenses" that require registration. When SORA was originally enacted, SORA stated:

---

[27] Effective January 1, 2006, the Legislature amended SORA to include certain restrictions on activities within a student safety zone, and it thus amended the title of SORA to add the language, "to prohibit certain individuals from engaging in certain activities within a student safety zone." See 2005 PA 127.

-42-

(d) "Listed offense" means any of the following:

(i) A violation of section 145a, 145b, or 145c of the Michigan penal code, Act No. 328 of the Public Acts of 1931, being sections 750.145a, 750.145b, and 750.145c of the Michigan Compiled Laws.

(ii) A third or subsequent violation of any combination of the following:

> (A) Section 167(1)(f) of Act No. 328 of the Public Acts of 1931, being section 750.167 of the Michigan Compiled Laws.

> (B) Section 335a of Act No. 328 of the Public Acts of 1931, being section 750.335a of the Michigan Compiled Laws.

> (C) A local ordinance substantially corresponding to a section described in sub-subparagraph (A) or (B).

(iii) A violation of section 455 of Act No. 328 of the Public Acts of 1931, being section 750.455 of the Michigan Compiled Laws.

(iv) A violation of section 520b, 520c, 520d, 520e, or 520g of Act No. 328 of the Public Acts of 1931, being sections 750.520b, 750.520c, 750.520d, 750.520e, and 750.520g of the Michigan Compiled Laws.

(v) An attempt or conspiracy to commit an offense described in subparagraphs (i) to (iv).

(vi) An offense substantially similar to an offense described in subparagraphs (i) to (v) under a law of the United States, any state, or any country.

See 1994 PA 295, § 2. "Listed offenses" thus consisted, at that time, of: accosting, enticing or soliciting a child for immoral purposes, MCL 750.145a, 750.145b; involvement in child sexually abusive activity or material, MCL 750.145c; indecent or obscene conduct in a public place, MCL 750.167(1)(f); indecent exposure, MCL 750.335a; procuring or inducing a person to engage in prostitution, MCL 750.455; offenses relating to criminal sexual conduct, MCL 750.520b, 750.520c, 750.520d, 750.520e, 750.520g; as well as attempts or conspiracies to commit such offenses, or similar offenses under certain local ordinances or laws of other states, the United States, or other countries. It thus appears that all of the "listed offenses," at that time, involved conduct that was, in some fashion, of a sexual nature.

Also in 1994, Congress passed, as part of the Violent Crime Control and Law Enforcement Act of 1994, 42 USC 13701 *et seq.*, the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, 42 USC 14071 *et seq.* ("Wetterling Act"). The United States Supreme Court has described the Wetterling Act as "condition[ing] certain federal law enforcement funding on the States' adoption of sex offender registration laws and sets minimum standards for state programs." *Smith v Doe*, 538 US 84, 89-90; 123 S.Ct 1140, 1145; 155 L Ed 2d 164 (2003). By its terms, however, the act directs the United States Attorney General to establish guidelines for State programs that require registration by "a person who is

convicted of a criminal offense against a victim who is a minor or who is convicted of a sexually violent offense." 42 USC 14071(a)(1)(A). States were afforded three years in which to implement the requirements of the statute and, in the Attorney General's discretion, an additional two years if making good faith efforts to do so. 42 USC 14071(f)(1). Non-compliance by a State would result in a loss of federal funding. 42 USC 14071(f)(2).

The Wetterling Act thus directed states to require registration not only by persons convicted of a "sexually violent offense," but additionally of persons convicted of "a criminal offense against a victim who is a minor." 42 USC 14071(a)(1)(A). Further, it defined the term "criminal offense against a victim who is a minor" as including not only a variety of specified offenses of a sexual nature, but as additionally including "kidnapping of a minor, except by a parent," 42 USC 14071(a)(3)(A)(i), and "false imprisonment of a minor, except by a parent," 42 USC 14071(a)(3)(A)(ii).

The Michigan Legislature responded in 1999 with an amendment to SORA enacted as 1999 PA 85. That amendment, in part, expanded SORA's definition of "listed offenses" to include, *inter alia*, "[a] violation of section 349 of the Michigan penal code, 1931 PA 328, MCL 750.349 [kidnapping], if a victim is an individual less than 18 years of age." *Id*.; MCL 28.722(d)(*v*).

Although the Wetterling Act also directed states to require registration of persons convicted of the crime of "false imprisonment of a minor, except by a parent," 42 USC 14071(a)(1)(A); 42 USC 14071(a)(3)(A)(ii), Michigan did not enact a statute creating a crime of "unlawful imprisonment" until 2006. It was then that Michigan enacted 2006 PA 160, which established in Michigan the crime of unlawful imprisonment, MCL 750.349b. Thereafter, and by the enactment of 2011 PA 17, Michigan amended SORA to include as a "tier I" "listed offense" a "violation of section 349b of the Michigan penal code, 1931 PA 328, MCL 750.349b, if a victim is a minor." 2011 PA 17; MCL 28.722(k); MCL 28.722(s)(*iii*).

Finally, in 2002, prior to the 2011 addition—as a "listed offense"—of the crime of unlawful imprisonment of a minor, the Legislature amended SORA in part by adding section 1a, denominated as MCL 28.721a, which declares the Legislature's intent as follows:

> The legislature declares that the sex offenders registration act was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger. [MCL 28.721a; 2002 PA 542.]

As noted, SORA at that time did not include the crime of unlawful imprisonment, MCL 750.349b, of a minor as a "listed offense"; it did, however, include other crimes of a non-

sexual nature, such as kidnapping, MCL 750.349, of a minor as listed offenses. Consequently, we must conclude that it was the Legislature's intent, in adopting MCL 28.721a in 2002, to include those who were convicted of such non-sexual listed offenses as among the offenders subject to SORA's registration requirement.

This historical backdrop brings us back to whether defendant has stated a valid change of purpose challenge under the Title-Object Clause. We hold that he has not. First, the title of SORA has not appreciably changed since its original enactment in 1994; it has always provided for registration by persons convicted of "certain offenses." Second, while it is true that SORA was amended from time to time to add additional offenses requiring registration, those amendments did not change the "purpose" of SORA in any fundamental or material way. As stated above, the purpose of SORA is, and always has been, to assist law enforcement, and to protect the public, particularly children, from future offenses by offenders who have committed certain offenses that the Legislature has deemed at risk of recidivism. MCL 28.721a. The subject matter of the amendments was thus "germane to the original purpose." *Boulton*, 272 Mich App at 466, citing *Cynar*, 252 Mich App at 86.

While the Legislature did use the words "criminal sexual acts" and "sex offenders" in describing SORA's purpose, MCL 28.721a, we do not, indulging the presumption of constitutionality, *Mirac*, at 470 Mich at 422-423, and considering the overall context of the enactment and amendment of SORA, as discussed in this opinion, find that the inclusion within SORA of the "listed offense" of unlawful imprisonment, MCL 750.349b, of a minor, or of other offenses not necessarily of a non-sexual nature against a minor, changes the purpose of SORA so as to run afoul of the Title-Object Clause of the Michigan Constitution.

Having rejected defendant's constitutional arguments, we hold that the trial court did not err, as a matter of constitutional law, in requiring that defendant register under SORA.

## D. LEGISLATIVE SOLUTION

There nonetheless remains something troubling about the fact that defendant, while an offender who may properly and constitutionally be required to register in furtherance of the purpose of SORA, is deemed a "sex offender" even though the offenses of which he was convicted, including the offenses for which he is required to register, as well as the conduct underlying them, were wholly non-sexual in nature. In other words, as noted earlier in this opinion, there is a degree of vagueness or ambiguity—although not one rising to the level of a constitutional violation—inherent in SORA's "short title ("sex offenders registration act") and in SORA's use of the term "sex offender"—without defining it—as including non-sexual crimes against minors.

As we note in this opinion, we conclude that SORA clearly requires that defendant register under the act, and we find nothing unconstitutional in that requirement. However, the depth of the analysis that was required for us to reach that conclusion, and the number of pages that were required for us to properly articulate that conclusion, give us pause. Notwithstanding the lack of constitutional implications, something is amiss. As a practical matter, and as a matter of common parlance, a registrant under SORA is deemed to be a "sex offender" and is thus assumed and understood to have been convicted of a crime of a sexual nature, even when the

crime, although committed against a minor, was of a non-sexual nature. That, we believe, should be rectified.

Although defendant has not made the case for finding—and we do not find—a constitutional violation, we thus do believe that a remedy is in order. Ultimately, that remedy is properly one for the Legislature to address. Specifically, we invite the Legislature to amend SORA to eliminate its vagueness and ambiguity, and any resulting misperceptions. The specifics of any such legislative amendments are properly left to the Legislature; however, we offer the following observations and suggestions, in part derived from legislative approaches in other states. First, an amendment to the "short title" of SORA would seem to be in order. It could be as simple as calling it the "Child Offenders and Sex Offenders Registration Act." Second, we would encourage an amendment to the legislative purpose as set forth in MCL 28.721a—not to change the legislative purpose, but rather to more clearly articulate the existing legislative purpose as relating both to child offenders and sex offenders. Third, we would encourage the Legislature to consider adding a definition of "sex offender" and "sex offense," as the federal SORNA legislation does. Fourth, because adding such definitions would not eliminate the perceived injustice inherent in labeling a non-sexual child offender as a "sex offender," the Legislature might consider separately defining a "child offender" and "child offense."[28] Fifth, and in lieu of defining "sex offender" and "child offender," the Legislature might consider (as has been done in Kentucky)[29] defining a "registrant" as a person convicted of a "sex offense" or a "child offense." Finally, the Legislature might consider (as was done in Illinois)[30] creating separate registers for child offenders and sex offenders, perhaps both under the purview of a single "Child Offenders and Sex Offenders Registration Act."

## XIV. CONCLUSION

We conclude that defendant's convictions were not against the great weight of the evidence, nor was the evidence insufficient to support his convictions; therefore, defendant also was not bound over in error. We further find no errors requiring reversal in the prosecution's conduct during discovery or trial. Defendant was not denied the effective assistance of counsel. Defendant's convictions did not implicate double jeopardy considerations. Defendant's rights were sufficiently protected during his joint trial. Additionally we find no reversible error in the trial court's instructions to the jury, nor do we find that defendant was denied the ability to present a defense. We find no errors requiring resentencing; however we remand for administrative correction of the judgment of sentence to conform to the jury verdict. Finally, we reject defendant's constitutional challenges to his required registration under SORA, but call for legislative action to address aspects of the statute as discussed in this opinion.

---

[28] We note that Ohio has recently amended its sex offender registration statute to include a category entitled "child-victim offender" for those offenders who have committed "child-victim oriented offenses" including abduction and imprisonment offenses. See Ohio Rev Code Ann (West), 2950.01(C)-(D).

[29] Ky Rev Stat Ann 17.500 (5) (West); see also *Moffit*, 360 SW3d at 257.

[30] See 730 Ill Comp Stat Ann 150/1 (West), *et seq*.; 730 Ill Comp Stat Ann (West) 154/1, *et seq.*

Affirmed as to defendant's convictions and sentences. Remanded to the trial court for entry of an amended judgment of sentence conforming defendant's sentences to the jury verdict. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Michael J. Riordan
/s/ Jane M. Beckering